*In re* MARRIAGE OF JULIE A. BETTS, Petitioner-Appellee, and JOHN A. BETTS, Respondent-Appellant.—*In re* MARRIAGE OF JULIE A. BETTS, Petitioner-Appellee, and JOHN A. BETTS, Respondent-Appellant (Kenneth A. Kozel, Contemnor-Appellant).

Fourth District Nos. 4—89—0443, 4—89—0455 cons.

Opinion filed June 28, 1990.—Rehearing denied August 24, 1990.

28

34

36

Kenneth A. Kozel, of La Salle, for appellants.

Paul R. Wilson, Jr., of Wilson & Lanto, P.C., of Rantoul, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

These consolidated appeals are the latest chapter in the sad tale of the former marriage of Julie and John Betts. Previous opinions of this court dealing with this subject include *In re Marriage of Betts* (1987), 155 Ill. App. 3d 85, 507 N.E.2d 912 *(Betts I)*,. *In re Marriage of Betts* (1987), 159 Ill. App. 3d 327, 511 N.E.2d 732 *(Betts II)*, *In re Marriage of Betts* (1988), 172 Ill. App. 3d 742, 526 N.E.2d 1138 *(Betts III)*, and *In re Marriage of Betts* (1989), 190 Ill. App. 3d 961, 547 N.E.2d 686 *(Betts IV)*. We will not lengthen this opinion by recapitulating the holdings of these previous decisions, but will refer to them insofar as they are relevant to the issues presented by the present appeals.

The proceedings which resulted in the latest appeals commenced when John Betts filed a petition in March 1989 in the Cook County circuit court. That petition requested modification of the September 1982 order of the circuit court of Ford County, which dissolved the marriage of John and Julie Betts. The 1982 dissolution order required John to pay child support of $35 per week for each of the parties' children. The petition for modification which John filed in Cook County alleged that subsequent to the dissolution of the parties' marriage, Julie became a resident of Cook County. The petition requested John's child support obligation be modified so that the educational expenses of the parties' daughter, Jodie, would be shared on an equitable basis and John's obligation to provide support for their son, John,

Jr., would cease upon his emancipation. At the same time, John filed a petition requesting enrollment in Cook County of the Ford County dissolution judgment.

On April 14, 1989, Judge Caisley of the Eleventh Judicial Circuit, acting on the request of Julie's counsel, entered an *ex parte* temporary restraining order (TRO) which found that Julie was a *bona fide* resident of Ford County, although she was at the time a student at Garrett Evangelical Seminary in Evanston. The TRO provided that as long as Julie remains domiciled in Ford County, John is to cease and desist from maintaining any actions against her arising out of their former marital relationship "in any other jurisdiction" than Ford County. The TRO further required John to dismiss the modification action then pending in Cook County by promptly filing a motion for voluntary nonsuit and enjoined John from registering the judgment which dissolved the parties' marriage "in any other jurisdiction" as long as Julie remained domiciled in Ford County. Also on April 14, 1989, Julie filed a petition for injunctive relief, requesting that John be both temporarily and permanently enjoined from commencing or prosecuting any actions relating to the dissolution of his and Julie's marriage or any post-judgment litigation against Julie anywhere other than in Ford County.

A notice of hearing addressed to John's attorney, Kenneth A. Kozel, indicated that the petition for injunctive relief was set for hearing on April 28, 1989. A proof of service indicates that this notice was served on Kozel by ordinary mail. A separate proof of service indicates that a copy of the April 14, 1989, TRO was served on Kozel in the same manner.

On April 19, 1989, an affidavit of service of the modification petition on Julie was filed in the Cook County circuit court. On the same day, Kozel and Julie, who was not represented by counsel, appeared in the Cook County circuit court. Julie handed Kozel a copy of the April 14, 1989, TRO, and Kozel indicated that he did not consider himself bound by that order. The circuit court of Cook County continued the cause in order to allow Julie to obtain counsel.

On April 28, 1989, Julie filed in Ford County a petition for a rule to show cause directed to John and Kozel. This petition alleged that Kozel was served in open court in Cook County with a copy of the TRO, but nevertheless prepared an order continuing the Cook County modification proceeding. The petition alleged that this action constituted "willful and contumacious indirect criminal contempt" of the court. On the same day, Julie filed a virtually identical petition for a rule to show cause directed to John and Kozel, alleging that John's

obtaining a continuance of the Cook County action amounted to indirect civil contempt of court; Julie also filed petitions for rules to show cause directed to John and Kozel that alleged their conduct amounted to direct civil contempt of court and direct criminal contempt of court. Also on April 28, Julie filed still another petition for a rule to show cause, alleging that John had failed to pay child support from March 31 through April 28, 1989. Julie alleged that this failure constituted "indirect civil and indirect criminal contempt of court."

Also on April 28, 1989, John filed in Ford County, in response to Julie's petition for injunctive relief, a special and limited appearance for the purpose of objecting to both subject-matter and personal jurisdiction. This special and limited appearance alleged that neither John nor Julie resided in Ford County and that no summons or notice had ever been served on John personally. This pleading further alleged that although Kozel had received a written notice of the April 28, 1989, hearing, he had not received a petition for injunctive relief as asserted in the notice of hearing. Also, John alleged that Julie had previously appeared before the Cook County circuit court, consented to that court's jurisdiction, and moved that court for a continuance. The allegations contained in this special and limited appearance were supported by John's affidavit.

On the same day (April 28, 1989), the circuit court entered an "Order for Rule to Show Cause" based on each of the following alleged acts and omissions: (1) indirect criminal and civil contempt on John's part in failing to make child support payments from March 31 through April 28, 1989; (2) indirect civil and criminal contempt on the part of John and Kozel in obtaining a continuance of the Cook County proceeding; and (3) direct civil and criminal contempt on the part of John and Kozel in obtaining a continuance of the Cook County proceeding. All of these orders required the parties to whom they were directed to appear in court on June 2, 1989, and to show cause why they should not be judged guilty of and punished for contempt of court.

Also on April 28, 1989, the circuit court overruled John's special and limited appearance. As to Julie's petition for injunctive relief, the court found that neither of the parties was a resident of Cook County and that Julie was a resident of Ford County. The court therefore enjoined John from enrolling the judgment of dissolution "in any other court in any other jurisdiction" or seeking modification of that judgment "in any other jurisdiction" until such time as the court found that Julie was no longer a resident of Ford County.

A written permanent injunction order directed to John was filed

on May 3, 1989. In addition to the provisions announced by the court at the April 28, 1989, hearing, this order required John to cause the Cook County modification proceeding to be dismissed within 10 days of its entry. A proof of service attached to this order indicates that on May 4, 1989, a copy was sent to both John and Kozel by ordinary mail.

On May 1, 1989, Julie filed in the Cook County circuit court a motion requesting transfer of the modification proceeding to Ford County and a section 2—619 motion (Ill. Rev. Stat. 1987, ch. 110, par. 2—619) requesting dismissal of the modification proceeding. Julie filed a second section 2—619 motion in the circuit court of Cook County on May 3, 1989, and, on May 15, 1989, filed still another section 2—619 motion in Cook County.

On May 15, 1989, John filed in Ford County a motion requesting that the court vacate the TRO for lack of jurisdiction. Among other things, this motion alleged that (1) the court had lost jurisdiction of the parties and subject matter and nothing had been done to invoke the court's jurisdiction or revest the court with jurisdiction, (2) the TRO was "heard and decided in McLean County" and neither John nor Julie resided or had resided in McLean County, and (3) no petition for a preliminary injunction had been filed or heard with respect to the case. Also on May 15, 1989, Kozel, acting on his own behalf, filed a motion for a change of judge with respect to the proceedings on the orders for rules to show cause insofar as they were directed to him.

On May 22, 1989, a hearing was held on John's motion to vacate the TRO for lack of jurisdiction. The circuit court found that Julie remained a *bona fide* resident of Ford County and was residing only temporarily in Cook County while enrolled as a student at Garrett Evangelical Theological Seminary. The court further found that Julie had no intention of residing permanently in Cook County after completing her theological education. For these reasons, the circuit court denied John's motion to vacate the TRO. At this hearing, Julie was represented by attorney Paul Wilson, Jr., who also represented her in the Ford County proceedings, and the court allowed Wilson's motion on behalf of Julie to direct Kozel to execute a motion to dismiss (1) the proceedings seeking enrollment of the dissolution judgment in Cook County, and (2) subsequent proceedings filed by John in the Cook County circuit court. The court ordered Kozel to execute in open court a motion to dismiss the Cook County proceedings. Kozel did this after first stating his objections. The original copy of the motion to dismiss which Kozel signed was given to Julie's counsel for filing in the Cook County circuit court. (The docket entries indicating

the orders which the court entered on this date are dated May 25, 1989.)

On May 24, 1989, a hearing was held in the Cook County circuit court on John's petition for modification of his child support obligation. Kozel presented a written motion for leave to withdraw as John's counsel. The basis for this motion was apparently the May 3, 1989, injunction issued by the Ford County circuit court requiring dismissal of the Cook County modification proceeding. Kozel expressed a fear that he would be jailed by Judge Caisley if he proceeded in the Cook County action. Wilson presented to the circuit court the motion to dismiss which Kozel had signed in open court per order of the circuit court of Ford County. In a written order entered May 31, 1989, Judge Kaufman of the Cook County circuit court stated:

"The court being duly advised of the facts surrounding the signing of said Motion To Dismiss [signed in open court] by Kenneth A. Kozel and that said Motion To Dismiss was signed by Kenneth A. Kozel under duress, denies said Motion To Dismiss and considers said Motion To Dismiss null and void, there being no obligation on the part of an attorney, an officer of the court, to be forced to move to dismiss this case upon the order of a judge."

The court continued the case to July 12, 1989, for a status hearing and for a possible hearing on Julie's motions to dismiss and transfer the cause.

On May 26, 1989, Wilson sent Kozel a notice of a June 2, 1989, hearing on two additional petitions for rule to show cause. The first of the additional petitions for rule to show cause, which was filed on May 30, 1989, was directed to John and alleged that he had wilfully and contumaciously refused to dismiss the Cook County modification proceeding, in violation of a court order entered "[o]n or about the 1st day of May 1989." The petition alleged his "actions are in direct or indirect criminal contempt of this court." The second of the additional petitions for rule to show cause, directed to Kozel, alleged that he was given notice of a court order, entered "[o]n or about the 1st day of May 1989" requiring dismissal of the Cook County modification proceeding. The petition alleged that Kozel's failure to cause the Cook County action to be dismissed was "direct or indirect contumacious contempt of this Court's order." This petition requested issuance of an order requiring Kozel to show cause why he should not be held in "indirect or direct criminal contempt" of court.

On May 30, 1989, Julie filed in the Ford County circuit court proofs of service of various documents. These proofs of service indi-

cated that (1) on May 5, 1989, Kozel was personally served with a copy of the circuit court's April 28, 1989, "Order for Rule to Show Cause" based on alleged direct civil contempt consisting of Kozel obtaining a continuance of the Cook County modification action; (2) various petitions for rule to show cause were also served on Kozel on May 5, 1989; (3) on May 9, 1989, John was personally served with a copy of the April 28, 1989, "Order for Rule to Show Cause" alleging indirect criminal contempt of court consisting of Kozel, on behalf of John, preparing an order continuing the Cook County modification proceeding; and (4) various petitions for rule to show cause were also served on John on May 9, 1989.

Also on May 30, 1989, John filed a "special and limited appearance to the permanent injunction." He requested that the injunction be "moved [sic] for lack of jurisdiction over the person and the subject matter."

On May 31, 1989, John filed a notice of appeal from the April 14, 1989, TRO and from all orders entered on May 25, 1989. This appeal is docketed in this court as case No. 4—89—0443.

On June 2, 1989, attorneys Kozel and John W. Hardin III filed additional special and limited appearances on behalf of John and Kozel. The essence of these pleadings was that John was not properly served with process with respect to the petitions for rule to show cause and the "Order for Rule to Show Cause." These pleadings were supported by affidavits.

At a hearing held on June 2, 1989, the court overruled the special and limited appearance filed on behalf of John on the ground that the affidavits of a private process server stating John was served with process were more credible than the affidavits denying service of process. The court found John guilty of indirect criminal contempt in that he (1) wilfully failed to pay child support prior to the beginning of contempt proceedings; and (2) wilfully violated the permanent injunction and TRO by refusing to dismiss the Cook County modification proceeding. The court imposed consecutive sentences of six months' imprisonment on John for each of these contempts, with the sentences to be served consecutively to a previously imposed contempt sentence. The court also entered a judgment against John for attorney fees and expenses in the amount of $4,050, plus court costs. The court denied a motion to set an appeal bond for John and ordered that a warrant and mittimus issue for the arrest and incarceration of John on both contempt sentences.

The court also found attorney Kozel in indirect civil contempt of court based on his wilful violation of the TRO and permanent injunc-

tion by refusing to cause the motion to dismiss the Cook County modification proceeding to be presented to and granted by the Cook County circuit court. The court indicated that Kozel could purge himself of contempt by promptly causing the Cook County proceeding to be dismissed. The court entered a judgment against Kozel for attorney fees in the amount of $3,815 and expenses of $210, plus court costs. The court set an appeal bond for Kozel in the amount of $8,120.

On June 2, 1989, John and Kozel filed a notice of appeal from all orders entered on that date. This appeal was docketed in this court as case No. 4—89—0455.

On June 20, 1989, John and Kozel filed an amended notice of appeal in·case No. 4—89—0443. In this notice, they indicated that they were appealing the orders of April 14 and April 17, 1989, which granted Julie's request for a TRO, and all orders entered on May 25, 1989. The appeals, docketed case Nos. 4—89—0443 and 4—89—0455, were consolidated by order of this court.

### I. NOTICE OF APPEAL

Before considering the alleged errors in the circuit court proceedings, we must determine which of the circuit court orders are properly before this court for review. Throughout her brief, Julie contends John and Kozel did not properly perfect an appeal from the orders entered on June 2, 1989. Her basis for this argument is that in the amended notice of appeal filed on June 20, 1989, appellants did not list the orders entered on June 2, 1989, but listed only orders entered prior to that date. Apparently, Julie's position is that the June 20, 1989, amended notice of appeal completely supersedes and nullifies the notice of appeal which John and Kozel filed on June 2, 1989, which does indicate that they are appealing the June 2, 1989, orders.

■ A notice of appeal must inform the appellee of the nature of the appeal by specifying "the judgment or part thereof appealed from." (107 Ill. 2d R. 303(c)(2).) However, notices of appeal are to be liberally construed so that mere deficiencies in form as opposed to substance do not deprive the reviewing court of jurisdiction. (*Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 435, 394 N.E.2d 380, 383; *Dillman & Associates, Inc. v. Capitol Leasing Co.* (1982), 110 Ill. App. 3d 335, 339, 442 N.E.2d 311, 315.) Moreover, an amended notice of appeal relates back to the date the original notice of appeal was filed (107 Ill. 2d R. 303(c)(4)), and the purpose of an amended notice of appeal is to permit correction of omissions from the original notice of appeal. *Hale v. Ault* (1974), 24 Ill. App. 3d 10, 14, 321 N.E.2d 151, 153.

■ In case No. 4—89—0455, the June 2, 1989, notice of appeal informed Julie and her counsel that an appeal was being taken from the orders entered on June 2, 1989. These were possibly the most important orders entered in the present phase of this dissolution of marriage action, and Julie and her counsel could not reasonably have inferred that John and Kozel intended to abandon or waive their right to appeal these orders by later filing an amended notice of appeal. Moreover, Julie points to no prejudice she suffered as a result of appellants' failure to list the June 2, 1989, orders in their amended notice of appeal. (See *Burtell*, 76 Ill. 2d at 436, 394 N.E.2d at 384; *Betts II*, 159 Ill. App. 3d at 330, 511 N.E.2d at 734.) For these reasons, we hold that appellants' failure to list the June 2, 1989, orders in their amended notice of appeal does not bar appeal of those orders.

## II. CONTEMPT

In this case, John was found guilty of indirect criminal contempt, and Kozel was found guilty of indirect civil contempt. The distinctions between the various categories of contempt—civil and criminal, direct and indirect—have not always been clearly drawn. (See *Marcisz v. Marcisz* (1976), 65 Ill. 2d 206, 208-09, 357 N.E.2d 477, 479, citing *People ex rel. Chicago Bar Association v. Barasch* (1961), 21 Ill. 2d 407, 409-10, 173 N.E.2d 417, 418.) Because the procedures which must be followed in contempt cases vary according to the type of contempt involved, proper classification of contempt charges is not a mere academic exercise. That classification is essentially a function of the purpose for which contempt sanctions are imposed and where the allegedly contemptuous conduct occurred.

Because the procedural problems regarding the various contempt proceedings in the present case are representative of difficulties that trial courts seem to have when processing contempt matters, we believe a review of the law of contempt in general will be helpful not only to understand our analysis of this case, but also to assist trial courts in avoiding similar procedural problems in the future.

### A. Civil and Criminal Contempt Distinguished

■ The primary determinant of whether contempt proceedings are civil or criminal in nature is the purpose for which contempt sanctions are imposed. If contempt sanctions are imposed for coercive purposes—to compel the contemnor to perform a particular act—the contempt is civil in nature. On the other hand, criminal contempt sanctions are imposed for the purpose of punishing past misconduct. *E.g., Hicks v. Feiock* (1988), 485 U.S. 624, 631-35, 99 L. Ed. 2d 721,

731-33, 108 S. Ct. 1423, 1429-31; *County of Cook v. Lloyd A. Fry Roofing Co.* (1974), 59 Ill. 2d 131, 135, 319 N.E.2d 472, 475; *People v. Gholson* (1952), 412 Ill. 294, 298, 106 N.E.2d 333, 336.

■ Civil contempt proceedings have two fundamental attributes: (1) The contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order. (*People ex rel. Melendez v. Melendez* (1971), 47 Ill. 2d 383, 387, 266 N.E.2d 327, 329; *Betts I*, 155 Ill. App. 3d at 103-04, 507 N.E.2d at 921.) In other words, the contemnor must have an opportunity to purge himself of contempt by complying with the pertinent court order. If the contempt sanction is incarceration, the respondent's circumstances should be such that he may correctly be viewed as possessing the " 'keys to his cell.' " *In re Marriage of Logston* (1984), 103 Ill. 2d 266, 289, 469 N.E.2d 167, 177.

■ The conduct sought to be coerced by civil contempt proceedings often confers benefits on opposing parties in civil litigation. The most familiar example is jailing a former spouse who, although able to do so, fails to make timely child support or maintenance payments. (*E.g., Betts I*, 155 Ill. App. 3d at 89-90, 105, 507 N.E.2d at 915, 926; *Logston*, 103 Ill. 2d at 289, 469 N.E.2d at 177.) However, civil contempt is not limited to civil litigation of this type. Civil contempt sanctions may also be used to compel testimony before a grand jury (see *In re Grand Jury Proceedings of August, 1984* (7th Cir. 1985), 757 F.2d 108, 115, *cert. denied sub nom. Ghibaudy v. United States* (1985), 471 U.S. 1018, 85 L. Ed. 2d 306, 105 S. Ct. 2025), or to compel an individual to produce handwriting exemplars, to furnish fingerprints, or to permit photographs of himself or herself to be taken during grand jury proceedings. See *In re Grand Jury Investigation* (5th Cir. 1977), 565 F.2d 318, 320-21; *In re Grand Jury Proceedings* (3d Cir. 1975), 507 F.2d 963, 966-68.

■ ■ In contrast to the coercive purpose of civil contempt sanctions, the reasons for imposing punishment for criminal contempt are much the same as the rationale for punishing other types of misdemeanor criminal conduct—retribution, deterrence, and vindication of the norms of socially acceptable conduct. We speak of "misdemeanor" criminal conduct because in almost all criminal contempt proceedings, the defendant is not afforded the opportunity for a jury trial, thus limiting his punishment upon a guilty verdict to no more than six months in jail and a comparatively small fine. (See *Bloom v. Illinois* (1968), 391 U.S. 194, 209-11, 20 L. Ed. 2d 522, 533-34, 88 S. Ct. 1477, 1486-87; *Duncan v. Louisiana* (1968), 391 U.S. 145, 159-62, 20

L. Ed. 2d 491, 501-03, 88 S. Ct. 1444, 1452-54.) We note that if a defendant charged with criminal contempt is afforded a jury trial, Illinois law presently provides for no maximum penitentiary sentence if he is convicted. *People v. Stollar* (1964), 31 Ill. 2d 154, 159, 201 N.E.2d 97, 99.

■ The principal specific societal norms vindicated in criminal contempt proceedings are the following: (1) judges and other court officials are entitled to respect when performing their judicial duties; (2) judicial proceedings should be conducted in an orderly manner; (3) court orders should be obeyed; and (4) individuals should not commit fraud upon the courts. See *United States v. United Mine Workers of America* (1947), 330 U.S. 258, 302-03, 91 L. Ed. 884, 917-18, 67 S. Ct. 677, 700-01.

■ The conduct which may be punished by means of criminal contempt proceedings covers the entire gamut of disrespectful, disruptive, deceitful, and disobedient acts (or failures to act) which affect judicial proceedings. Perhaps the most readily recognizable example is an outburst on the part of spectators or litigants which disrupts judicial proceedings. (*E.g., In re Dellinger* (7th Cir. 1974), 502 F.2d 813, 816-17, *cert. denied* (1975), 420 U.S. 990, 43 L. Ed. 2d 671, 95 S. Ct. 1425; *People v. Jashunsky* (1972), 51 Ill. 2d 220, 227, 282 N.E.2d 1, 5.) Also punishable as criminal contempt are statements made in open court which suggest that trial judges are guilty of criminal conduct (*People v. Kelleher* (1983), 116 Ill. App. 3d 186, 192, 452 N.E.2d 143, 147, *cert. denied* (1984), 466 U.S. 907, 80 L. Ed. 2d 160, 104 S. Ct. 1686), the filing in court of a spurious will and an application for its probate (*In re Estate of Kelly* (1936), 365 Ill. 174, 179, 6 N.E.2d 113, 115), and communications with jurors intended to influence the outcome of litigation (*Kemner v. Monsanto Co.* (1986), 112 Ill. 2d 223, 249, 492 N.E.2d 1327, 1339). Criminal contempt may also consist of disobedience of a court order (*e.g., People v. Graves* (1979), 74 Ill. 2d 279, 284-85, 384 N.E.2d 1311, 1314; *People v. Townsend* (1989), 183 Ill. App. 3d 268, 270-71, 538 N.E.2d 1297, 1299) and, of particular relevance to the case at bar, of a failure by an attorney to abide by an injunction concerning proceedings in another court in which the attorney represents one of the litigants. See *Farwell v. Great Western Telegraph Co.* (1896), 161 Ill. 522, 614-18, 744 N.E. 891, 920-22 (in appropriate case, court may enjoin other proceedings pending in same court); Ill. Rev. Stat. 1987, ch. 110, par. 11—101 (injunction is binding on parties to an action, and their officers, agents, employees, and *attorneys*).

■ Just as certain conduct forms the basis for both damage

46

awards in civil tort actions and the imposition of criminal penalties, the same conduct may form the basis for both criminal and civil contempt sanctions. For example, a battery may give rise to both a civil suit in which the victim obtains compensation for his or her injuries and to a criminal prosecution in which the defendant is punished for his failure to abide by the norms of socially acceptable conduct. Similarly, an individual's failure to abide by a court order may result in the imposition of sanctions intended to coerce compliance with the order, as well as other sanctions which are a punishment of the contemnor for his wilful disobedience of the court order. *E.g., United Mine Workers of America* (1947), 330 U.S. 258, 298-301, 91 L. Ed. 884, 915-17, 67 S. Ct. 677, 698-700; *Brocker v. Brocker* (1968), 429 Pa. 513, 519, 241 A.2d 336, 338-39, *cert. denied* (1969), 393 U.S. 1081, 21 L. Ed. 2d 773, 89 S. Ct. 857.

In instances where both civil and criminal sanctions are imposed, analysis of the purpose of these multiple sanctions may be aided if they are viewed in the following fashion. Criminal sanctions are *retrospective* in nature; they seek to punish a contemnor for past acts which he cannot now undo. Civil sanctions are *prospective* in nature; they seek to coerce compliance at some point in the future. That point might be immediate compliance in open court or whenever the contemnor chooses to use his "key"—namely, compliance—to open the jailhouse door.

Thus, for example, in a marital case in which one former spouse has refused to execute a quitclaim deed for the benefit of the other spouse, contrary to the property disposition in a judgment of dissolution, it may be entirely appropriate to jail the recalcitrant spouse for a determinate sentence (up to six months) for his indirect criminal contempt based upon his *past* failure to comply with the court order, and at the same time, to impose an indeterminate sentence for his indirect civil contempt to coerce him to execute the deed at some future point. In this hypothetical, in order to fulfill the purposes of both civil and criminal contempt, the court need not order the determinate sentence to begin until such time as the civil contempt sanction is satisfied by the contemnor's compliance with the order in question. The above scenerio presumes that all appropriate procedural steps have been complied with leading to the separate contempt findings.

Criminal contempt sanctions may to some extent benefit parties to litigation, and civil contempt sanctions may vindicate judicial authority. For instance, civil contempt sanctions sometimes consist of a fine for each day a violation of a court order continues. (*Madden v. Grain Elevator, Flour & Feed Mill Workers, International*

*Longshoreman Association, Local 418* (7th Cir. 1964), 334 F.2d 1014, 1017, 1020, *cert. denied* (1965), 379 U.S. 967, 13 L. Ed. 2d 560, 85 S. Ct. 661; see generally *Spallone v. United States* (1990), 493 U.S. 265, _____, 107 L. Ed. 2d 644, 653, 110 S. Ct. 625, 630; *United States v. Barnett* (5th Cir. 1963), 330 F.2d 369, 377-78.) In such cases, the fines, once accrued, are a punishment for past misconduct. However, the test for determining whether contempt proceedings are criminal or civil in nature is the dominant purpose for which sanctions are imposed. Any incidental results or benefits of imposing the sanctions are of no consequence in making this determination. (*Brocker*, 429 Pa. at 519, 241 A.2d at 338-39.) Thus, the fact that accrued daily fines for civil contempt are a punishment for past misconduct does not alter the fundamentally coercive nature of a sanction consisting of the daily accumulation of additional fines.

#### B. Direct and Indirect Contempt Distinguished

 Contemptuous conduct is also categorized on the basis of whether it is direct or indirect. Direct contempt is contemptuous conduct which occurs in the presence of a judge. It is strictly limited to actions seen and known by the judge. (*People v. L.A.S.* (1986), 111 Ill. 2d 539, 543, 490 N.E.2d 1271, 1273.) The most readily recognizable examples of direct contempt are criminal contempts consisting of outbursts during court proceedings or other disruptions of judicial proceedings. *E.g., Dellinger*, 502 F.2d 813, 816-17; *Jashunsky*, 51 Ill. 2d at 227, 282 N.E.2d at 5.

 However, direct contempt may also be civil contempt if it consists of disobedience to directives to perform specific acts in open court in compliance with previously entered court orders. Examples of direct civil contempt include a refusal to execute in open court a deed of assignment of property to a receiver (*Tolman v. Jones* (1885), 114 Ill. 147, 151, 153, 28 N.E. 464, 464-65); a refusal by a debtor in open court to turn over an automobile which he owns to a bailiff so that it may be sold and the proceeds applied to satisfaction of his debts (*North American Investment & Loan Association, Inc. v. Kitzer* (1944), 321 Ill. App. 347, 348, 53 N.E.2d 142, 142-43, *error dismissed* (1945), 389 Ill. 54, 58 N.E.2d 881); and refusal to produce documents in response to a grand jury subpoena where, after several hearings and motions concerning the subpoena, the trial judge has personal knowledge of the facts establishing noncompliance with the subpoena. *People v. I.W.I., Inc.* (1988), 176 Ill. App. 3d 951, 955-56, 531 N.E.2d 1001, 1005.

 Some decisions hold that there is a subcategory of direct

contempt consisting of contemptuous acts not personally seen by a judge, but which take place in an integral or constituent part of the court. These acts are thus deemed to have occurred within the constructive presence of the court. (*People v. Javaras* (1972), 51 Ill. 2d 296, 299, 281 N.E.2d 670, 672.) Matters such as a refusal to provide records to a grand jury (*People v. Skar* (1964), 30 Ill. 2d 491, 493, 198 N.E.2d 101, 102) and the filing of contemptuous documents in court (*People ex rel. Kunce v. Hogan* (1977), 67 Ill. 2d 55, 60-62, 364 N.E.2d 50, 51-53), including the filing of a will known to be spurious (*In re Estate of Melody* (1969), 42 Ill. 2d 451, 452-53, 248 N.E.2d 104, 105-06; *In re Estate of Kelly* (1936), 365 Ill. 174, 179, 6 N.E.2d 113, 115), fall within this subcategory of direct contempt. The existence of a separate subcategory for these types of contempts is, however, unnecessary. As will be demonstrated later in this opinion, the same procedural requirements apply to adjudications of charges of contemptuous conduct included in this subcategory as apply to adjudications of charges of indirect contempt.

To state the definition of direct contempt—contemptuous conduct occurring in the presence of the court or in a constituent part of the court—is to answer the question of what constitutes indirect contempt. Simply put, indirect contempt includes all contempts which do not occur in such proximity to a court that they fall within the direct contempt category. In indirect contempt cases, the judge does not have full personal knowledge of all elements of the contempt. Therefore, proof of facts of which the court cannot take judicial notice must be presented in order to support a finding of contempt. (*L.A.S.*, 111 Ill. 2d at 543, 490 N.E.2d at 1273; *People v. Harrison* (1949), 403 Ill. 320, 324, 86 N.E.2d 208, 210.) As illustrated by the present case and many others like it, the most common type of misconduct included in the indirect contempt category is failure to comply with child support and maintenance orders, but indirect contempt also covers the entire range of contemptuous conduct which does not occur in open court or in a constituent part of the court.

### III. PROCEDURAL RIGHTS OF PERSONS CHARGED WITH CONTEMPT

Any discussion of the procedural requirements applicable to contempt proceedings must begin with the observation that contempt proceedings are *sui generis*. (*People v. Doss* (1943), 382 Ill. 307, 311-12, 46 N.E.2d 984, 987; *In re Peasley* (1989), 189 Ill. App. 3d 865, 869, 545 N.E.2d 792, 794.) Thus, although various constitutional requirements designed to insure the fairness of judicial proceedings apply to contempt proceedings, neither the Code of Civil Procedure (Ill.

Rev. Stat. 1987, ch. 110, par. 1—101 *et seq.*), nor the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, pars. 100—1 through 125—4) is fully applicable to such proceedings. See *Peasley,* 189 Ill. App. 3d at 869, 545 N.E.2d at 794.

Individuals charged with direct contempt which occurred in the actual presence of a judge enjoy fewer constitutionally guaranteed procedural rights than those charged with indirect contempt or with direct contempt which occurred in the constructive presence of a court. Additionally, fewer constitutionally mandated procedural rights apply to persons charged with civil contempt than apply to those charged with criminal contempt. We now examine the specific procedural requirements applicable to each of the categories of contempt.

*A. Procedural Rights of Persons Charged with*
*Direct Criminal Contempt*

■■ In direct criminal contempt proceedings in which a judge has personal knowledge of all of the facts establishing contemptuous conduct, "no formal charge is filed and no plea, issue or trial is required." Moreover, "[the presentation of] evidence is unnecessary." (*People v. Loughran* (1954), 2 Ill. 2d 258, 263, 118 N.E.2d 310, 313.) Because the respondent is entitled to appeal a direct contempt conviction, the record made in the trial court must, however, be sufficient to permit a reviewing court to determine whether the trial court had jurisdiction to enter the contempt order. Thus, the facts supporting the finding of contempt must be fully set forth in the contempt order (*Jashunsky,* 51 Ill. 2d at 226, 282 N.E.2d at 4) or must appear in the transcript of the proceedings at which the contempt finding was made. *People v. Tomashevsky* (1971), 48 Ill. 2d 559, 564, 273 N.E.2d 398, 402.

■■ In direct contempt proceedings, there need not be a specific manifestation of contemptuous intent. Rather, such intent may be inferred from the nature of the contemptuous act and the surrounding circumstances. *Kunce,* 67 Ill. 2d at 61, 364 N.E.2d at 52; *Sunset Travel, Inc. v. Lovecchio* (1983), 113 Ill. App. 3d 669, 675, 447 N.E.2d 891, 895.

■■ ■ A finding of direct contempt may be made in a summary manner immediately after the contemptuous conduct occurs. This is the practice followed if the purpose of imposing sanctions is to restore order in the courtroom or to maintain control over proceedings in the courtroom. (See *Johnson v. Mississippi* (1971), 403 U.S. 212, 214, 29 L. Ed. 2d 423, 426, 91 S. Ct. 1778, 1779; *Illinois v. Allen* (1970), 397 U.S. 337, 344-45, 25 L. Ed. 2d 353, 359-60, 90 S. Ct. 1057, 1061-62.)

However, where the immediate imposition of direct contempt sanctions is not necessary to maintain order in the courtroom, a contempt adjudication may be postponed until after the conclusion of the trial or hearing. At that time, the presiding judge may either make a direct contempt adjudication (see *Sacher v. United States* (1952), 343 U.S. 1, 11, 96 L. Ed. 717, 724, 72 S. Ct. 451, 456) or assign the matter of the purported direct contempt to another judge for determination solely upon the record of the proceedings in which the contemptuous conduct allegedly occurred. Where (1) an individual reviles a judge during a judicial proceeding, (2) it is likely the remarks "left personal stings," and (3) sanctions for contempt are not immediately imposed for the purpose of maintaining order in the courtroom, due process requires adjudication of the contempt charges by a judge other than the one who presided at the proceedings in which the contemptuous conduct allegedly occurred. *Mayberry v. Pennsylvania* (1971), 400 U.S. 455, 464, 466, 27 L. Ed. 2d 532, 539, 540, 91 S. Ct. 499, 504, 505.

When the aggregate punishments for a particular course of criminally contemptuous conduct committed in the presence of a judge exceed the parameters of punishments normally imposed for misdemeanors and the punishments are not imposed immediately after occurrence of the contemptuous conduct, the contemnor is entitled to a jury trial as to the contempt charges. (*Bloom*, 391 U.S. at 208-11, 20 L. Ed. 2d at 533-34, 88 S. Ct. at 1486-87; *United States v. Seale* (7th Cir. 1972), 461 F.2d 345, 352-56.) The traditional test for determining whether or not a charged offense is a misdemeanor is whether the penalties exceed $500 or six months' imprisonment. (*Duncan v. Louisiana* (1968), 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444; *Baldwin v. New York* (1970), 399 U.S. 66, 70-71, 26 L. Ed. 2d 437, 441, 90 S. Ct. 1886, 1889; 2 W. LaFave & J. Israel, Criminal Procedure §21.1, at 693 (1984).) Where, as with criminal contempt in Illinois, no maximum punishment is prescribed for an offense (*Stollar*, 31 Ill. 2d at 159, 201 N.E.2d at 99), courts look to the penalty actually imposed to determine whether an offense is so serious that a jury trial was required. (*Bloom*, 391 U.S. at 211, 20 L. Ed. 2d at 534, 88 S. Ct. at 1487.) Some decisions suggest that in the context of contempt proceedings, the $500 fine component of the traditional test for determining whether an offense is a misdemeanor is subject to upward adjustment on the basis of the contemnor's financial resources and inflationary trends. See *Muniz v. Hoffmann* (1975), 422 U.S. 454, 475-77, 45 L. Ed. 2d 319, 334-36, 95 S. Ct. 2178, 2190-91 (imposition of $10,000 fine did not entitle 13,000-member labor union to a jury

trial on a criminal contempt charge); *Fox Valley AMC/Jeep, Inc. v. AM Credit Corp.* (7th Cir. 1988), 836 F.2d 366, 368 (imposition of $5,000 fine did not entitle individual criminal contemnor to jury trial).

■■ An individual charged with direct criminal contempt who has no right to a jury trial under the United States Constitution also has no right to a jury trial under either the Illinois Constitution or Illinois statutory or common law. Section 13 of article I of the Illinois Constitution (Ill. Const. 1970, art. I, §13) does preserve the right to a jury trial as it existed at common law. (*Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, 323-24, 347 N.E.2d 736, 740-41; *People v. Lobb* (1959), 17 Ill. 2d 287, 298-99, 161 N.E.2d 325, 331-32.) However, the weight of authority is that at common law all contempts were tried summarily; a jury trial was not available as a matter of right under any circumstances. (*Bloom*, 391 U.S. at 198 n.2, 20 L. Ed. 2d at 527 n.2, 88 S. Ct. at 1480 n.2, citing 4 W. Blackstone Commentaries, ch. 20, at 286-87 (Lewis ed. 1897), and 2 W. Hawkins, A Treatise of the Pleas of the Crown 4, 141 (2d ed. 1724).) Moreover, a contemptuous act does not violate any Illinois penal statute and thus is not an offense to which the provisions of the Code of Criminal Procedure of 1963 apply. (Ill. Rev. Stat. 1987, ch. 38, par. 102—15.) Therefore, the jury trial provision contained in the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 103—6), which extends the right to a jury trial to those charged with even petty offenses such as speeding (*People v. Beil* (1979), 76 Ill. App. 3d 924, 927-28, 395 N.E.2d 400, 402-03), is inapplicable to criminal contempt charges.

■■ ■ When a jury trial is required for an alleged direct criminal contempt because of the severity of the sentence imposed or sought to be imposed, the trial must conform to the procedural requirements applicable to trials of other serious criminal charges to the extent they do not conflict with the caveat that direct contempt charges are to be adjudicated solely upon the record of the judicial proceedings in which the contemptuous conduct allegedly occurred. Thus, at the trial of a charge of serious direct criminal contempt, the respondent is entitled to counsel, including appointed counsel if indigent, the right to be present at trial if he or she is not disorderly, and the right to have the trial held in a public place. (See *State v. Roll* (1973), 267 Md. 714, 730-31 & n.12, 298 A.2d 867, 877 & n.12, 69 A.L.R.3d 483, 495 & n.12; 3 W. LaFave & J. Israel, Criminal Procedure §§23.1 through 23.7 (1984).) The respondent is also entitled to have his guilt proved beyond a reasonable doubt. (See *Marcisz*, 65 Ill. 2d at 209-10, 357 N.E.2d at 479; *Betts IV*, 190 Ill. App. 3d at 966-67, 547 N.E.2d at 690.) These procedural rights do not, however, apply to

trials of alleged direct criminal contempts for which a jury trial is not constitutionally mandated—even those which are not adjudicated immediately upon occurrence of the contemptuous conduct. (*People v. Collins* (1978), 57 Ill. App. 3d 934, 937, 373 N.E.2d 750, 752; *People v. Clark* (1972), 4 Ill. App. 3d 301, 305, 280 N.E.2d 723, 726.) Summary proceedings in these cases do not impair any of a contemnor's constitutional rights. *People v. Siegal* (1948), 400 Ill. 208, 211-12, 79 N.E.2d 616, 618; *Clark*, 4 Ill. App. 3d at 305, 280 N.E.2d at 726.

### B. Procedural Rights of Persons Charged with Direct Civil Contempt

 Direct civil contempts may be summarily adjudicated immediately upon occurrence of the contemptuous acts in the same manner as direct criminal contempts for which sanctions are imposed for the purpose of maintaining order in the courtroom. The constitutional right to a jury trial does not apply to direct civil contempts. (See *Tolman*, 114 Ill. at 153, 28 N.E. at 464-65; *I.W.I., Inc.*, 176 Ill. App. 3d at 955, 531 N.E.2d at 1004-05.) As previously noted, at common law there was no right to a jury trial for contempt. Thus, the jury trial provision of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §13) is inapplicable to this category of contempt. Additionally, there are no cogent public policy reasons for permitting jury trials in direct civil contempt cases. Direct civil contempt usually involves an unequivocal refusal to perform an affirmative act for the benefit of an opposing litigant in open court, such as a refusal to sign a document. Accordingly, there are usually no disputed factual questions similar to those which may be present in direct criminal contempt proceedings, such as whether the respondent's conduct actually did disrupt court proceedings or denigrated the dignity or authority of the court.

### C. Procedural Rights of Persons Charged with Indirect Civil Contempt

 Indirect civil contempt sanctions may not be imposed upon an individual unless he or she has been accorded due process of law with respect to the contempt charges. (*People ex rel. Williams v. Williams* (1987), 156 Ill. App. 3d 438, 442, 509 N.E.2d 460, 463.) However, the process which is due in such cases is that applicable to civil proceedings which affect property rights; it is not the same due process which must be accorded those charged with criminal offenses. A recent United States District Court decision aptly and succinctly states the due process requirements applicable to this category of contempt:

"In civil contempt, the contemnor is entitled to minimal due process. *Shillitani v. United States*, 384 U.S. 364, 371, 86 S. Ct. 1531, 1536, 16 L. Ed. 2d 622 (1966). The basic components of due process are notice and opportunity to be heard. *Ex Parte Robinson*, 86 U.S. (19 Wall.) 505, 512-13, 22 L. Ed. 205 (1873)." (*Crooks v. Maynard* (D. Idaho 1989), 718 F. Supp. 1460, 1465.)

The notice must, of course, contain an adequate description of the facts on which the contempt charge is based and inform the alleged contemnor of the time and place of an evidentiary hearing on the charge within a reasonable time in advance of the hearing. (*Welding Industrial Supply Co. v. Northtown Industries, Inc.* (1978), 58 Ill. App. 3d 625, 629, 374 N.E.2d 1002, 1005-06; *In re Estate of Shlensky* (1977), 49 Ill. App. 3d 885, 893, 364 N.E.2d 430, 436.) An individual charged with indirect civil contempt may waive service of written notice of the charge by voluntarily appearing in court and defending against the charge. See 17 C.J.S. *Contempt* §79, at 201 (1963).

■ Contrary to the recent decision of the First District Appellate Court in *Sanders v. Shephard* (1989), 185 Ill. App. 3d 719, 728-30, 541 N.E.2d 1150, 1156-57, and the authority cited therein, we conclude that a respondent in an indirect civil contempt proceeding is not entitled to appointed counsel if he or she is indigent, even though the contempt proceeding may result in imprisonment. The sole United States Supreme Court decision upon which the *Sanders* court relied is *Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 68 L. Ed. 2d 640, 101 S. Ct. 2153. In *Lassiter*, the Supreme Court held that indigent defendants in termination of parental rights proceedings do not have an absolute constitutional right to court-appointed counsel. The apparent basis for the *Sanders* court's conclusion that indigents facing indirect civil contempt charges which may result in imprisonment are entitled to appointed counsel is the following statement in the *Lassiter* opinion:

"That it is the defendant's interest in personal freedom, and not simply the special Sixth and Fourteenth Amendments right to counsel in criminal cases, which triggers the right to appointed counsel is demonstrated by the Court's announcement in *In re Gault*, 387 U.S. 1, [18 L. Ed. 2d 527, 87 S. Ct. 1428,] that 'the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency *which may result in commitment to an institution in which the juvenile's freedom is curtailed*,' the juvenile has a right to appointed counsel even though those proceedings may be styled

'civil' and not 'criminal.' *Id.*, at 41, [18 L. Ed. 2d at 554, 87 S. Ct. at 1451] (emphasis added). Similarly, four of the five Justices who reached the merits in *Vitek v. Jones*, 445 U.S. 480, [63 L. Ed. 2d 552, 100 S. Ct. 1254,] concluded that an indigent prisoner is entitled to appointed counsel before being involuntarily transferred for treatment to a state mental hospital. The fifth Justice differed from the other four only in declining to exclude the 'possibility that the required assistance may be rendered by competent laymen in some cases.' *Id.*, at 500[, 63 L. Ed. 2d at 570, 100 S. Ct. at 1267] (separate opinion of POWELL, J.)." (Emphasis in original.) (*Lassiter*, 452 U.S. at 25-26, 68 L. Ed. 2d at 648-49, 101 S. Ct. at 2158-59.)

This statement does not unequivocally support the *Sanders* court's conclusion with regard to the right of indigents to court-appointed counsel in indirect civil contempt proceedings.

The *Lassiter* Court also cited *Scott v. Illinois* (1979), 440 U.S. 367, 59 L. Ed. 2d 383, 99 S. Ct. 1158. In *Scott*, an indigent defendant was tried in Illinois and convicted of shoplifting. Although the applicable statutes called for a possible jail sentence of up to one year, the defendant was only fined $50. Defendant appealed, arguing that he was entitled to court-appointed counsel because there had been a possibility of incarceration upon his conviction. Both the Illinois Supreme Court and the United States Supreme Court affirmed the conviction. The United States Supreme Court held that a defendant, if not actually incarcerated, was not entitled to court-appointed counsel under the sixth and fourteenth amendments to the United States Constitution. In *Scott*, the Court clarified its holding in *Argersinger v. Hamlin* (1972), 407 U.S. 25, 32 L. Ed. 2d 530, 92 S. Ct. 2006, by stating the following:

"Although the intentions of the *Argersinger* Court are not unmistakably clear from its opinion, we conclude today that *Argersinger* did indeed delimit the constitutional right to appointed counsel in state criminal proceedings. *** *Argersinger* has proved reasonably workable, whereas any extension would create confusion and impose unpredictable, but necessarily substantial, costs on 50 quite diverse States. We therefore hold that the Sixth and Fourteenth Amendments to the United States Constitution require only that no indigent criminal defendant be sentenced to a term of imprisonment unless the State has afforded him the right to assistance of appointed counsel ***." *Scott*, 440 U.S. at 373-74, 59 L. Ed. 2d at 389, 99 S. Ct. at 1162.

It is interesting to note Justice Powell's short, concurring opinion in *Scott*, stated in its entirety as follows:

"For the reasons stated in my opinion in *Argersinger v. Hamlin*, 407 U.S. 25, 44[, 32 L. Ed. 2d 530, 542, 92 S. Ct. 2006, 2016] (1972), I do not think the rule adopted by the Court in that case is required by the Constitution. Moreover, the drawing of a line based on whether there is imprisonment (even for overnight) can have the practical effect of precluding provision of counsel in other types of cases in which conviction can have more serious consequences. The *Argersinger* rule also tends to impair the proper functioning of the criminal justice system in that trial judges, in advance of hearing any evidence and before knowing anything about the case except the charge, all too often will be compelled to forgo the legislatively granted option to impose a sentence of imprisonment upon conviction. Preserving this option by providing counsel often will be impossible or impracticable—particularly in congested urban courts where scores of cases are heard in a single sitting, and in small and rural communities where lawyers may not be available.

Despite my continuing reservations about the *Argersinger* rule, it was approved by the Court in the 1972 opinion and four Justices have reaffirmed it today. It is important that this Court provide clear guidance to the hundreds of courts across the country that confront this problem daily. Accordingly, and mindful of *stare decisis*, I join the opinion of the Court. I do so, however, with the hope that in due time a majority will recognize that a more flexible rule is consistent with due process and will better serve the cause of justice." *Scott*, 440 U.S. at 374-75, 59 L. Ed. 2d at 389-90, 99 S. Ct. at 1162-63 (Powell, J., concurring).

The United States Supreme Court in *Scott* did not extend *Argersinger*, thereby refusing to require appointment of counsel in a criminal case when the defendant was not imprisoned, even though the statute under which the defendant was charged provided for the possibility of incarceration.

None of the lower Federal court cases cited in *Sanders* are from the United States Circuit Court of Appeals for the Seventh Circuit. That court has, however, recently (if somewhat obliquely) discussed both the issue of requiring court-appointed counsel in indirect civil contempt cases and some of the decisions from Federal courts so holding. In *Mann v. Hendrian* (7th Cir. 1989), 871 F.2d 51, plaintiff Mann was found to be in indirect criminal contempt of court for fail-

ure to pay court-ordered child support and sentenced to 60 days in jail. Mann did not appeal, but rather filed a civil rights action against the judge under section 1983 of the Civil Rights Act of 1957 (42 U.S.C. §1983 (1982)). The suit alleged that the judge neither advised Mann of his right to retain counsel nor of his right to court-appointed counsel, thereby violating his sixth amendment right to counsel. The district court dismissed the cause of action, and the Seventh Circuit affirmed. In its opinion, the court touched on *Ridgway v. Baker* (5th Cir. 1983), 720 F.2d 1409, 1413, and *Walker v. McLain* (10th Cir. 1985), 768 F.2d 1181, 1183, both of which were cited in *Sanders*, and stated that the two cases held the following:

> "[T]here is a right to counsel in a purely civil contempt proceeding that eventuates in imprisonment, albeit for a term wholly dependent on the defendant's own obduracy. Cf. *In re Gault*, 387 U.S. 1, 27, 41, 87 S. Ct. 1428, 1443, 1451, 18 L. Ed. 2d 527 (1967); *United States v. Bobart Travel Agency, Inc.*, 699 F.2d 618 (2d Cir. 1983). And *Ridgway* and *Bobart*, along with several cases cited in them, *suggest that there is a right to counsel in civil contempt proceedings,* period, unless it is made clear to the defendant at the outset that he will not be imprisoned for the contempt. See [*Ridgeway*,] 720 F.2d at 1415; [*Bobart Travel Agency*,] 699 F.2d at 620. *This position seems inconsistent with Scott v. Illinois, but that is not an issue we need pursue in this case.*" (Emphasis added.) *Mann*, 871 F.2d at 52.

An earlier decision of this court, *People ex rel. Williams v. Rhodes* (1989), 185 Ill. App. 3d 114, 116-18, 540 N.E.2d 1114, 1115-16, is similarly supportive of the position that a respondent in an indirect civil contempt proceeding is not entitled to court-appointed counsel.

■■■ Imprisonment for civil contempt is unique in that the contemnor may secure his immediate release from incarceration by either complying with the court order which he has refused to obey or demonstrating that he is unable to comply with that order. Neither compliance nor establishing the impossibility of compliance is such a difficult task that the assistance of counsel is necessary.

Also, unlike criminal contempt proceedings, civil contempt proceedings often do not pit a respondent against a prosecutor backed by the entire resources of the State. As the Ohio Court of Appeals observed in *Retz v. Retz* (1978), 62 Ohio App. 2d 158, 163, 405 N.E.2d 313, 316-17:

> "There is a major distinction between criminal proceedings,

brought by the state for its protection on behalf of all the people and prosecuted by agents with all the resources of the state, and private civil proceedings that may provoke contempt, but in which the state is no more than indirectly concerned. This is not to say that the government has no interest in children who are without income for their support or citizens whose rights are violated; however, in such situations the initiation and thrust of civil relief rests exclusively with those involved and, unless authorized by statute—as in criminal offenses based upon nonsupport—the power and resources of the state are not utilized in any manner other than as in any other civil action. In the first situation, the public reaps the protection and benefit of criminal actions and must pay the piper; in the latter, a civil action is initiated to enforce a private obligation and the benefit derived is for a private purpose. The extent to which economic relief is extended to individuals to aid them in prosecuting or defending civil disputes is a legislative question and not an issue that has as yet been recognized as within the mandatory constitutional guarantee of due process in civil cases."

■ For the above reasons, we hold that indigents faced with jail sentences for indirect civil contempt are not entitled to court-appointed counsel. In such proceedings, courts should, of course, afford respondents every reasonable opportunity to establish that compliance with the court orders which they are accused of violating is impossible and to request vacatur of the contempt sanctions imposed upon them on that basis. See *Debowski v. Shred Pax Corp.* (1977), 45 Ill. App. 3d 891, 904-05, 359 N.E.2d 204, 214.

■ Moreover, no right to a jury trial exists in indirect civil contempt proceedings. (*Shillitani v. United States* (1966), 384 U.S. 364, 365, 16 L. Ed. 2d 622, 624, 86 S. Ct. 1531, 1533; *Cheff v. Schnackenberg* (1966), 384 U.S. 373, 377, 16 L. Ed. 2d 629, 632, 86 S. Ct. 1523, 1524; *Shlensky*, 49 Ill. App. 3d at 894, 364 N.E.2d at 437.) No jail sentence for indirect civil contempt will exceed six months unless the respondent, through his continued recalcitrance, makes it exceed six months. Prior to the expiration of a six-month period of incarceration, an indirect civil contemnor has ample opportunity either to comply with the court order in question or to explain why he or she cannot comply with it. Likewise, fines imposed for civil contempt, regardless of amount, do not trigger the constitutionally guaranteed right to a jury trial for serious offenses. Such fines may be minimized by immediate compliance with the court's order and are sometimes abated

upon a formerly contumacious defendant's full compliance with a court order. (See *United States v. Barnett* (5th Cir. 1965), 346 F.2d 99, 101.) Because of the contemnor's unique ability to control the imposition of sanctions in indirect civil contempt cases, the constitutional guarantee of a jury trial for criminal contempts when the penalty exceeds six months in jail is wholly inapplicable to indirect civil contempt proceedings.

### D. Procedural Rights of Persons Charged with
### Indirect Criminal Contempt

■■ ■ Indirect criminal contempt proceedings must generally conform to the same constitutionally mandated procedural requirements as other criminal proceedings. One charged with indirect criminal contempt is entitled to " '*** know the nature of the charge against him, to have it definitely and specifically set forth by citation or rule to show cause, and *** [have] an opportunity to answer ***.' " (*People v. Waldron* (1986), 114 Ill. 2d 295, 303, 500 N.E.2d 17, 21, quoting *People v. Pomeroy* (1950), 405 Ill. 175, 181, 90 N.E.2d 102, 105.) Also applicable to a respondent in an indirect criminal contempt proceeding are the privilege against self-incrimination, the presumption of innocence, and the right to be proved guilty beyond a reasonable doubt. (*Marcisz*, 65 Ill. 2d at 209-10, 357 N.E.2d at 479; *In re Marriage of Wilde* (1986), 141 Ill. App. 3d 464, 471, 490 N.E.2d 95, 100.) Additionally, the trial of an indirect criminal contempt charge must conform to all procedural requirements and rights normally applicable to criminal trials, including such rights as the right to counsel (and to appointed counsel if the respondent is indigent), to a public trial, to confront and cross-examine witnesses, to be personally present at trial, to testify or to remain silent, to compulsory process for obtaining witnesses, and to present the testimony of witnesses favorable to his or her defense. See *Roll*, 267 Md. at 730-31 & n.12, 298 A.2d at 877 & n.12, 69 A.L.R.3d at 495 & n.12; 3 W. LaFave & J. Israel, Criminal Procedure §§23.1 through 23.7 (1984).

■■ ■ Because a respondent in an indirect criminal contempt proceeding enjoys the privilege against self-incrimination, he may not be called by the petitioner to testify. Accordingly, a petition initiating indirect criminal contempt proceedings ought not have the title "Petition for Rule To Show Cause," the designation commonly (and appropriately) used for a petition initiating an indirect *civil* contempt proceeding; instead, a petition initiating an indirect criminal contempt proceeding ought to have the title "Petition for Adjudication of Criminal Contempt." By definition, if a respondent has a right not to tes-

tify, he cannot be required to "show cause" why he should not be held in indirect criminal contempt. Instead, the burden is on the petitioner to prove the charges in the petition beyond a reasonable doubt. An ancillary benefit of using such a title would be to force court and counsel into a recognition that such petitions differ from routine petitions for rules to show cause and require different procedural steps.

■ Neither the provisions of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 1—101 *et seq.*) nor the provisions of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, pars. 100—1 through 125—4) are strictly applicable to indirect criminal contempt proceedings, unless a particular provision is made specifically applicable by its language. *Peasley*, 189 Ill. App. 3d at 869, 545 N.E.2d at 794.

■ Indirect criminal contempt charges may be prosecuted by either the State's Attorney, counsel for a litigant, or *amicus curiae* appointed by the court. (*Marcisz*, 65 Ill. 2d at 210, 357 N.E.2d at 479.) In *Young v. United States ex rel. Vuitton* (1987), 481 U.S. 787, 95 L. Ed. 2d 740, 107 S. Ct. 2124, the Supreme Court held that counsel for a party which is the beneficiary of a court order may not prosecute contempt charges premised on an alleged violation of that order. However, the Supreme Court decided *Young* in the exercise of its supervisory power over the Federal courts. The Court indicated that it did not reach any constitutional issues. (*Young*, 481 U.S. at 809 & n.21, 95 L. Ed. 2d at 759-60 & n.21, 107 S. Ct. at 2138 & n.21.) Absent any constitutional infirmities in the practice which has long prevailed in Illinois with regard to who may prosecute indirect criminal contempts (appellants allude to none), we decline to overturn prior Illinois precedent concerning this matter. See *In re Estate of Wernick* (1988), 176 Ill. App. 3d 153, 158-59, 530 N.E.2d 1127, 1130-31.

■ The procedures applicable to indirect criminal contempt cases which we have just outlined also apply to charges of direct criminal contempt which allegedly occurred in the constructive presence of the court. In cases which fall within this subcategory of direct criminal contempt, the contemptuous conduct must be established by proof of facts of which the trial judge does not have direct knowledge. As in indirect criminal contempt cases, the presentation of evidence is necessary to establish these facts. Moreover, in constructive direct criminal contempt cases no need exists for prompt and summary action for the purpose of maintaining or restoring order in the courtroom. (See *Harris v. United States* (1965), 382 U.S. 162, 164-65, 15 L. Ed. 2d 240, 242-43, 86 S. Ct. 352, 354; *Roll*, 267 Md. at 731-36, 298 A.2d at 877-81, 69 A.L.R.3d at 495-99.) For these reasons, we conclude the

same procedural requirements apply to constructive direct criminal contempt proceedings as apply to indirect criminal contempt proceedings.

### IV. LAW OF CONTEMPT APPLIED TO THE FACTS OF THIS CASE

John asserts he did not receive adequate notice of the contempt proceedings against him. Because we conclude that (1) the circuit court orders which found John in contempt must be reversed on other grounds, and (2) it is not at all certain that the same circumstances pertaining to service of process will be present in future proceedings, we need not address this contention. For the same reasons, there is no need to discuss whether the circuit court erred in refusing John a continuance of the June 2, 1989, contempt hearing.

John asserts that several procedural irregularities require reversal of his contempt convictions: (1) he was improperly denied his right to representation by counsel at the hearing; (2) the circuit court did not find him guilty beyond a reasonable doubt; (3) the circuit court improperly refused to admit certain exhibits which he offered at the June 2, 1989, hearing; (4) the circuit court made findings unsupported by the evidence; (5) the circuit court improperly allowed private counsel to prosecute him for criminal contempt of court; and (6) Julie's petition for a permanent injunction relating to the Cook County modification proceeding did not state a cause of action.

Julie contends that John was not denied counsel at the June 2, 1989, hearing. She observes that the court denied a request by her counsel, Wilson, that Kozel be removed from the courtroom on that date. Julie further states that it is obvious that both Kozel and attorney Hardin represented John at the June 2, 1989, hearing. Also, Julie notes that the invalidity of a court order is no defense to a contempt charge based on an alleged violation of that order.

As previously noted, an individual charged with indirect criminal contempt has the right to be represented by counsel. (*Marcisz*, 65 Ill. 2d at 210, 357 N.E.2d at 479.) At the June 2, 1989, hearing, the circuit court stated:

> "I indicated when this matter was last before the Court on, on May 22nd, 1989, that in the event that Mr. Betts failed to appear in person, that I was going to bar his counsel from acting in his behalf, and that is exactly the sanctions that I am going to impose upon him, and I do deem that, that he has waived his right to be present, and we will proceed with him in absentia."

(This prohibition as to John being represented by counsel apparently applied only to the portion of the hearing concerning the merits of the

question of whether he was guilty of indirect criminal contempt and did not apply to the portion of the hearing which concerned John's contention that he was not properly served with process.) An examination of the transcript of the June 2, 1989, hearing reveals that throughout the hearing, the statements of Kozel were primarily, if not exclusively, directed toward defending himself against the contempts with which he was charged, rather than to defending John against the contempt charges pertaining to him. Hardin said virtually nothing during the hearing. The portions of the transcript of the June 2, 1989, hearing cited by Julie in support of her argument that John was not denied his right to counsel do not support a conclusion that Kozel and Hardin represented John at that hearing in a manner which was unimpeded by the court's ruling that John was to be denied his right to representation by counsel.

■■ Undoubtedly John's conduct throughout these proceedings was a great vexation to the circuit court. The court denied John his right to appear by counsel in an effort to secure his personal appearance in court after he had repeatedly failed to appear. However, denial of fundamental procedural rights is not an appropriate sanction for misconduct by criminal defendants, regardless of how egregious their misconduct may be. John was neither personally present nor permitted to be represented by counsel at the June 2, 1989, hearing. Essentially, the circuit court entered an indirect criminal contempt judgment by default. This action was error. The circuit court's denying John his right to be represented by counsel at the June 2, 1989, hearing requires reversal of his indirect criminal contempt convictions.

■■ When an individual is found guilty of indirect criminal contempt, the court must recite at either the contempt hearing or in its sentencing order that the defendant was found guilty beyond a reasonable doubt. (Betts IV, 190 Ill. App. 3d at 966-67, 547 N.E.2d at 690.) In the present case, the circuit court stated at neither the June 2, 1989, hearing nor in its docket entry for that date that it found John guilty beyond a reasonable doubt of indirect criminal contempt. This omission might not in itself require reversal of an indirect criminal contempt conviction in all cases. However, combined with the circuit court's refusal to allow John to be represented by counsel and with the confusion shown by the court and counsel in the record about whether particular proceedings were civil or criminal in nature, this omission is another basis for our conclusion that the adjudications of indirect criminal contempt with respect to John must be reversed.

■■ At the June 2, 1989, hearing, the circuit court refused to ad-

mit into evidence the following documents which Kozel sought to introduce: (1) an unsworn statement of an employee of the Paxton Post Office that Julie left no forwarding address when she moved from Paxton; (2) a certified copy of a real estate deed which indicated transfer of title to Julie's residence in Paxton to other persons; and (3) a certified copy of a property tax assessment printout showing the names of the present owners of Julie's residence in Paxton. These exhibits were obviously intended to demonstrate that Julie had abandoned her residence in Ford County and was no longer a resident of that county. As such, they were irrelevant to the question of whether appellants were guilty of contempt because even an erroneous court order must be obeyed until it is reversed or vacated. (*Allendorf v. Daily* (1955), 6 Ill. 2d 577, 589, 129 N.E.2d 673, 680; *Welch v. City of Evanston* (1989), 181 Ill. App. 3d 49, 54, 536 N.E.2d 866, 870.) Because these exhibits were relevant only to the question of the validity of the TRO and permanent injunction and because these matters were not at issue at the June 2, 1989, hearing, the circuit court acted properly in refusing to admit them.

John further notes that in finding him guilty of indirect criminal contempt, the circuit court stated that John had repeatedly refused to make child support payments, although "the man is a prosperous, practicing lawyer in La Salle County." John maintains that the quoted words are unsupported by the evidence. Only a portion of the circuit court record was filed in this appeal, and it does not contain the evidence relating to John's financial status. We will presume that the omitted portion of the record supports the trial court's conclusion as to John's ability to make child support payments. See *Brandel Realty Co. v. Olson* (1987), 159 Ill. App. 3d 230, 233, 512 N.E.2d 85, 86-87.

As previously indicated, contempt charges may continue to be prosecuted in Illinois courts by counsel for a litigant, the State's Attorney, or an *amicus curiae* appointed by the court, notwithstanding the United States Supreme Court's decision in *Young* (481 U.S. 787, 95 L. Ed. 2d 740, 107 S. Ct. 2124). Thus, there is no merit in John's argument that it was improper for Julie's counsel to prosecute the criminal contempt charges against him.

John's argument that Julie's petition for a permanent injunction concerning the Cook County modification proceeding did not state a cause of action is irrelevant to the question of whether he may be held in contempt for violating that injunction. As we have already stated, a belief that a court order is invalid does not excuse compliance with the order. (*Welch*, 181 Ill. App. 3d at 54, 536 N.E.2d at 870;

*Allendorf,* 6 Ill. 2d at 589, 129 N.E.2d at 680.) Absent a successful appeal of the permanent injunction pertaining to the Cook County modification proceeding, John was required to obey it, regardless of whether the petition which requested the injunction stated a cause of action.

Appellants next assert that the circuit court improperly denied a request for a change of judge. At the June 2, 1989, hearing, Kozel requested a change of judge. The basis for this motion was that the contempt charges against Kozel represented a new proceeding, which was different from the dissolution of marriage proceeding involving John and Julie Betts.

■■ A party to a post-decree dissolution of marriage proceeding does not have an automatic right to a change of judge if the judge then presiding over the proceeding has already made a substantive ruling in the case. In such cases a party may still request a change of judge on the basis of allegations of actual, specific prejudice on the part of the presiding judge. Whether to grant a motion for a change of judge based on such allegations is a matter of judicial discretion. *Betts I,* 155 Ill. App. 3d at 96, 507 N.E.2d at 919-20.

■■ Assuming that the proceeding which resulted in Kozel's being found in contempt of court was a proceeding different from the dissolution of marriage action involving John and Julie Betts, Kozel was not entitled to an automatic change of judge at the June 2, 1989, hearing. At the May 25, 1989, hearing, the circuit court ordered Kozel, over his objections, to sign a motion to dismiss the Cook County modification proceeding. This amounted to a substantive ruling which barred Kozel from later obtaining a change of judge as of right. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1001(c).) Kozel alleged no specific prejudice against him on the part of Judge Caisley; therefore, there was also no basis for granting him a change of judge on the basis of actual prejudice. *Dayan v. McDonald's Corp.* (1985), 138 Ill. App. 3d 367, 371-73, 485 N.E.2d 1188, 1191-92.

Kozel further maintains he should not have been found guilty of violating the April 14, 1989, TRO, because a copy of the order was first given to him at the April 19, 1989, hearing in the Cook County circuit court, at which John was not present. Kozel argues that because John was not present at the hearing, he was unable to consult with him to determine what to do about the TRO. He suggests that his obtaining dismissal of the Cook County action on April 19, 1989, without prior consultation with his client might have subjected him to both a malpractice claim and disciplinary action. He also maintains that the Cook County action was continued on that date upon Julie's

and not his request. Kozel also asserts that he did nothing to subject himself to punishment for violating the permanent injunction and that because he is not a party to the dissolution proceeding involving John and Julie, the Ford County circuit court lacked jurisdiction to compel him to do anything without having previously made him a party to the proceeding.

Julie responds that courts have jurisdiction to hold attorneys who participate in court proceedings in contempt. Julie maintains that Kozel violated the TRO in that after reading it, he attempted to dispute it before the Cook County circuit court. She also asserts Kozel violated the permanent injunction by resisting and denouncing the motion to dismiss the Cook County modification proceeding which Judge Caisley required him to sign in open court.

Neither the April 14, 1989, TRO nor the permanent injunction is directed to Kozel. The only court order directed to Kozel was entered at the May 22, 1989, hearing. At that hearing, Julie's counsel, Wilson, brought to the attention of the circuit court the fact that John had not complied with the requirement of the May 3, 1989, permanent injunction requiring him to dismiss the Cook County modification proceeding. Wilson stated that he had prepared a motion to dismiss the Cook County modification proceeding and requested that the court direct Kozel, who was counsel of record in that proceeding, to sign the motion. The court granted this request, and Kozel signed the motion in open court, after first stating his objections to this procedure. Surrounding Kozel's signature on the motion are the words, "Over objection and pursuant to order of Judge William Caisley in open court on May 22, 1989." After Kozel signed the motion, the following discussion occurred between the court and Mr. Wilson:

> "THE COURT: All right, in regard to the Petition for Rule to Show Cause, the counsel for Mr. Betts having signed the Motion to Dismiss as directed by the Court, I am going to deny the Petition for Rule to Show Cause.
>
> MR. WILSON: Your Honor, I believe that presupposes that counsel will not try to back out of his motion Wednesday morning [in the circuit court of Cook County].
>
> THE COURT: It does."

The petition for rule to show cause to which the court referred was apparently one of the April 28, 1989, petitions directed to John and Kozel. Apparently, the circuit court regarded Kozel's signing the motion to dismiss as a conditional purge of any contempt he previously committed in obtaining a continuance of the Cook County modification proceeding.

At a May 31, 1989, hearing, the Cook County circuit court denied the motion to dismiss which Kozel had signed in open court. Kozel did not object to this action on the part of the Cook County circuit court. Kozel was not served with an order to show cause or petition for a rule to show cause based on his conduct at the May 31, 1989, hearing in the Cook County circuit court.

However, after the denial at the June 2, 1989, hearing of his special and limited appearance objecting to jurisdiction, Kozel continued to participate in the indirect civil contempt proceedings directed to him. In so doing, he waived his objections that he was not properly served with process and did not receive sufficient notice of the civil contempt charges. Ill. Rev. Stat. 1987, ch. 110, par. 2—301(c); 17 C.J.S. *Contempt* §79, at 201 (1963).

The record contains unequivocal and uncontradicted evidence that at the May 31, 1989, hearing in the Cook County circuit court, Kozel violated the orders which the Ford County circuit court entered at the May 25, 1989, hearing by bringing to the attention of the Cook County circuit court that Kozel was only technically moving to dismiss the Cook County modification proceeding because he claimed he had been improperly coerced into signing the motion to dismiss by the Ford County circuit court. The fact that Kozel was not a party to the Betts' dissolution of marriage action is of no consequence. As pointed out by Julie, it is well established that a court has jurisdiction to punish an attorney for contemptuous acts committed in the course of proceedings pending before the court, even if he or she is not a party to the proceedings. See, *e.g., People v. Buckley* (1987), 164 Ill. App. 3d 407, 413-15, 517 N.E.2d 1114, 1118.

Moreover, public policy considerations require that attorneys obey court orders even when doing so might subject them to malpractice suits or disciplinary action. Obedience to a court order must be held to immunize performance of acts required by the order from both legal malpractice actions and attorney disciplinary proceedings. A contrary rule would seriously undermine the authority of the courts to compel compliance to their orders and would provide obdurate attorneys with an arguable basis for disobeying court orders.

John further argues that because Kozel was charged with only indirect civil contempt of court, he (John) should not have been charged with indirect criminal contempt. The short answer to this claim is that a respondent may be charged with whatever form of contempt the petitioner thinks the evidence will support. Additionally, we note that John has no more standing to challenge the petitioner's motives in an indirect criminal contempt proceeding than does a defend-

ant in any criminal case to challenge the motives of the State's Attorney.

■■■ Appellants also suggest that they should not have been found guilty of contempt because they lacked notice of the TRO and permanent injunction. Contrary to appellants' contentions, the record reflects that John and Kozel had actual notice of both the TRO and permanent injunction relating to the Cook County modification proceeding. The transcript of the April 19, 1989, hearing in the Cook County circuit court reflects that Kozel was served with a copy of the TRO in open court and thereby acquired knowledge of it. Moreover, on April 28, 1989, Kozel filed on John's behalf a special and limited appearance in response to Julie's petition for injunctive relief, which was supported by John's affidavit. Also, Kozel, on behalf of John, filed a motion to vacate the TRO on May 15, 1989, and Kozel, again on John's behalf, participated in a hearing on this motion on May 22, 1989. Furthermore, Kozel filed on John's behalf a special and limited appearance directed to the permanent injunction on May 30, 1989. Finally, on June 2, 1989, an affidavit of John in support of his special and limited appearance with respect to the contempt proceedings against him was filed in the circuit court of Ford County. These pleadings and affidavits are sufficient to support a conclusion that both John and Kozel had actual knowledge of the TRO and permanent injunction. An individual who has actual notice or knowledge of a court order which applies to him need not be served with a copy of the order before he can be found guilty of contempt for violating it. *People v. Maslowsky* (1966), 34 Ill. 2d 456, 466, 216 N.E.2d 669,´675; *National Metalcrafters v. Local 449, United Automobile, Aerospace & Agricultural Implement Workers AFL-CIO* (1984), 125 Ill. App. 3d 399, 407, 465 N.E.2d 1001, 1007-08.

■■■ As previously noted, both of John's indirect criminal contempt convictions must be reversed because he was denied his right to counsel and because the record does not establish he was found guilty beyond a reasonable doubt. Therefore, there is no need to discuss the propriety of the contempt sanctions which the circuit court imposed on John.

We note, however, that in *Betts III* (172 Ill. App. 3d at 746, 526 N.E.2d at 1141), this court held that John's practice (repeated in the proceedings here at issue) of refusing to make child support payments until after contempt proceedings are commenced constitutes a sufficient basis for punishing him for indirect *criminal* contempt, even if no child support payments are actually due when he is found in contempt. As discussed in part IIA of this opinion, if procedural steps ap-

propriate for charges of indirect criminal contempt have been taken, a contemnor may be found to be in indirect contempt, *both* civilly and criminally. The indirect criminal contempt in a case of wilful refusal to pay child support would be for the purpose of punishing that *past* contumacious behavior which has occurred. Therefore, a finding of indirect criminal contempt so based is in no way affected by any child support payments occurring after the contemptuous behavior took place. As we stated earlier, indirect criminal contempt is *retrospective*, focusing only on past acts as of a certain time. That the contemnor has since made his child support payments current is a factor to be considered by the court only in mitigation of the sentence to be imposed upon a finding of indirect criminal contempt and to be accorded what weight, *if any*, the trial court deems appropriate.

▐▌ Our reversal of John's indirect criminal contempt convictions also requires reversal of the award of attorney fees entered against him on June 2, 1989. Neither the transcript of the hearing held that day nor the docket entry for that date states the basis for this attorney fee award. Normally, an award of attorney fees is mandatory in a child support enforcement proceeding in which the custodial parent is granted relief and the court finds that the failure to pay child support was without cause or justification. (Ill. Rev. Stat. 1987, ch. 40, par. 508(b); *Betts III*, 172 Ill. App. 3d at 747, 526 N.E.2d at 1141; see also *Fogliano v. Fogliano* (1983), 113 Ill. App. 3d 1018, 1023, 448 N.E.2d 245, 249.) However, we are reversing John's indirect criminal contempt conviction arising out of his latest failure to make timely child support payments. Thus, Julie obtained no relief with respect to child support payments in *this* proceeding. Therefore, we cannot affirm the judgment against John for attorney fees as a mandatory fee award entered pursuant to section 508 of the Illinois Marriage and Dissolution of Marriage Act. Ill. Rev. Stat. 1987, ch. 40, par. 508(b).

### V. VALIDITY OF TEMPORARY RESTRAINING ORDER

As a final matter, we must consider appellants' contentions that both substantive and procedural defects render the TRO entered in this case invalid. Appellants first contend that the terms of the TRO went beyond what was necessary to preserve the status quo existing when it was entered. They maintain that the order sought to alter the existing status quo by requiring them to obtain dismissal of the Cook County modification proceeding. Appellants further argue that the TRO is invalid because it was not followed by a request for a preliminary injunction. Appellants maintain that because Julie did not follow the TRO with a request for a preliminary injunction, "the court must

\*\*\* dissolve the temporary restraining order." Additionally, appellants state that because the TRO was signed by Judge Caisley at his chambers in McLean County and was not initially entered in Ford County, where the order dissolving the Betts' marriage was entered, the TRO was entered in an entirely new action. Last, appellants assert that because there is nothing in the record which indicates that the McLean County circuit court had jurisdiction over them, the TRO is invalid for want of personal jurisdiction.

Julie maintains that it was necessary to include in the TRO a provision requiring dismissal of the Cook County modification action because the last peaceful status occupied by the parties—and the status quo to be preserved by the TRO—was the situation prevailing prior to the filing of the Cook County modification action. Julie states that her failure to obtain a preliminary injunction did not invalidate the TRO, because she ultimately obtained a permanent injunction and did not intend to rely on the TRO for more than 10 days after its issuance.

■ As appellants point out, section 11—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 11—101) provides that when a TRO is granted without notice, "the motion for a preliminary injunction shall be set for hearing at the earliest possible time," and that "when the motion comes on for hearing the party who obtained the [TRO] shall proceed with the application for a preliminary injunction and, if he or she does not do so, the court shall dissolve" the TRO.

■ However, no Illinois decision holds that failure to subsequently obtain a preliminary injunction retroactively invalidates a TRO, nor do we perceive any sound public policy reasons for so holding. The primary purpose of a TRO is to preserve the status quo until a hearing can be held on a request for further injunctive relief. (See *People ex rel. Pollution Control Board v. Lloyd A. Fry Roofing Co.* (1972), 4 Ill. App. 3d 675, 679, 281 N.E.2d 757, 760.) During the time it is in effect, a TRO is entitled to the same respect and obedience as any other court order. The failure of a party who obtained a TRO to subsequently secure a preliminary injunction containing the same provisions does not lessen the seriousness of violations of the TRO. Where, as in this case, a permanent injunction is obtained soon after the expiration of a TRO, adoption of appellants' position would allow flagrant violations of TROs to go unpunished merely because of the petitioner's failure to comply with a technical procedural requirement. We decline appellants' invitation to create a procedural loophole for the benefit of those inclined to disregard TROs.

■ We also reject appellants' argument that the TRO entered in

this case went beyond what was necessary to preserve the status quo because it required dismissal of the Cook County modification proceeding. The status quo to be preserved by a TRO is the last actual, peaceable, uncontested status which preceded the controversy. (*Board of Education of Springfield Public Schools, District No. 186 v. Springfield Education Association* (1977), 47 Ill. App. 3d 193, 196, 361 N.E.2d 697, 700-01.) In *District No. 186,* this court held that the status quo to be preserved by a TRO requiring striking teachers to return to work included the terms of an expired contract, rather than terms of employment which the school district unilaterally implemented after expiration of the contract. The basis for this holding was that the controversy commenced long before the school district unilaterally changed working conditions. Therefore, the last peaceable, uncontested status occupied by the parties included the terms of employment prescribed by the expired contract. This court held that issuance of a TRO requiring that the school district resume paying the teachers pursuant to the expired contract did not amount to the issuance of a mandatory injunction, but rather represented an attempt to maintain the status quo. *Springfield Public School District No. 186,* 47 Ill. App. 3d at 197, 361 N.E.2d at 701.

In the present case, the filing of the Cook County modification action created the controversy with which we are here concerned. Therefore, the last actual, peaceable, uncontested status occupied by the parties was that prevailing before the filing of the Cook County modification action, when the only pending legal proceeding relating to John's child support obligations was in Ford County. It follows that the TRO properly sought to preserve the status quo prevailing before the inception of the present controversy by requiring John to dismiss the Cook County modification proceeding.

There is also no merit in appellants' arguments that the TRO was issued in an entirely new action and without *in personam* jurisdiction. The TRO, bearing the caption of the Betts' dissolution of marriage case, was entered by Judge Caisley in his McLean County chambers on April 14, 1989, and was sent to the Ford County circuit clerk, who filed it on April 17, 1989. Even before the establishment of a unified court system in 1964, it was generally held that contentions that a matter was heard or decided in the wrong county went only to venue and did not create a jurisdictional question. (See *In re Estate of Willavize* (1960), 21 Ill. 2d 40, 43, 171 N.E.2d 21, 23.) Courts have continued to recognize this principle in cases decided since 1964 (see *In re Guardianship of Smythe* (1965), 65 Ill. App. 2d 431, 444-45, 213 N.E.2d 609, 615), and it ob-

viously applies with even greater force in a unified court system.

John did not posit a venue objection to the TRO in the circuit court proceedings. Therefore, he has waived any objections that the TRO was entered in an improper venue.

## VI. CONCLUSION

We conclude this opinion by expressing our hope that any future proceedings in this dissolution of marriage action will be conducted in a manner which will be conducive to effective appellate review of the proceedings. The contempt proceedings involved in the present appeals were conducted with a considerable degree of informality on the part of both the court and counsel. Indeed, as illustrated by the following exchange which occurred at the June 2, 1989, hearing, there were times when neither the court nor counsel were certain as to the nature or purpose of the proceedings:

"MR. WILSON: Your Honor, are we presenting evidence at this point or just arguing?

THE COURT: I don't know. I'm not sure, I'm not sure where we're going.

MR. KOZEL: I just want to know what is it that I'm being charged with. Is it just the two petitions for—

THE COURT: There are petitions for rule to show cause against you for direct civil and direct criminal contempt, and it's on those that we're still proceeding.

MR. KOZEL: Which have to do with the T.R.O. or the permanent injunction?

THE COURT: I'm not sure. I think both."

In addition to the confusion of court and counsel as to the purpose of various phases of these proceedings, our consideration of these appeals was made difficult by the lack of specificity in some of the circuit court orders. For instance, at the May 22, 1989, hearing, the court did not specifically state what petition for rule to show cause it denied as a result of Kozel signing the motion to dismiss the Cook County modification proceeding. Moreover, the court should have specifically stated that it regarded Kozel signing this motion as a conditional purge of previous contemptuous acts on his part, if that was in fact the court's intent. Similarly, the court should have precisely stated the basis on which it entered the award of attorney fees against John on June 2, 1989.

Any future efforts by Julie to obtain contempt findings against John on the same grounds on which the circuit court entered its June 2, 1989, contempt orders as to him must be preceded by timely notice

to John which specifies the relief sought and the bases on which Julie seeks such relief. In ruling on any such further claims for relief, the circuit court should precisely state the bases on which it enters its orders.

The April 17, 1989, temporary restraining order is affirmed.

The portions of the circuit court's June 2, 1989, order which found John in indirect criminal contempt of court and which assessed attorney fees, expenses, and costs against him are reversed.

The portions of the circuit court's June 2, 1989, order which found attorney Kozel in indirect civil contempt of court are affirmed, as are those portions of that order which assessed attorney fees against Kozel in the amount of $3,815 and expenses of $210, plus court costs.

By reversing the portions of the circuit court's June 2, 1989, order which found John in contempt, we do not hold that the evidence is insufficient to support these contempt findings as to John. Thus, our decision does not preclude Julie from seeking findings of indirect criminal contempt, the imposition of contempt sanctions, and an award of attorney fees, expenses, and costs against John on the basis of the same evidence on which the circuit court's June 2, 1989, contempt findings as to John were premised.

Affirmed in part; reversed in part and remanded.

SPITZ, J., concurs.

JUSTICE LUND, specially concurring:

I disagree with my esteemed brethren's conclusion that the TRO did not go beyond what was necessary to preserve the status quo. A temporary restraining order (TRO) without notice is not favored and should go no further than is essential to safeguard the rights of the plaintiff. (See Ill. Rev. Stat. 1989, ch. 110, par. 11—101; *Geesbreght v. Geesbreght* (1978), 63 Ill. App. 3d 37, 379 N.E.2d 738; 21A Ill. L. & Prac. *Injunctions* §142 (1977).) Even with notice, it should only be as broad as is essential to safeguard the rights of the plaintiff. (*Village of Wilsonville v. SCA Services, Inc.* (1981), 86 Ill. 2d 1, 426 N.E.2d 824.) The TRO should be justified upon the basis of preserving the status quo. (*Continental-Midwest Corp. v. Hotel Sherman, Inc.* (1957), 13 Ill. App. 2d 188, 141 N.E.2d 400; 21A Ill. L. & Prac. *Injunctions* §142 (1977).) The TRO, without hearing, should have been limited in scope to do only what was necessary, and that was to prohibit going forth in Cook County, not the dismissal of a pending action. If John

had, in a hearing after the entry of the TRO, established that his former wife had in fact removed from the Eleventh Judicial Circuit to Cook County, then proper venue could have been established in Cook County. (See section 512(c) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 512(c)).) The status quo would have been maintained by delaying the Cook County proceedings.

However, erroneous court orders must be obeyed until stayed, reversed, or vacated. *Allendorf v. Daily* (1955), 6 Ill. 2d 577, 129 N.E.2d 673; *Welch v. City of Evanston* (1989), 181 Ill. App. 3d 49, 54, 536 N.E.2d 866, 870.