# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People ex rel. City of Chicago v. Le Mirage, Inc., 2011 IL App (1st) 093547**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE *ex rel.* THE CITY OF CHICAGO, a municipal corporation, Petitioner-Appellee, v. LE MIRAGE, INC., a/k/a La Mirage All Nite Studio, Ltd., Dwain Johnson Kyles, and Calvin Hollins, Jr., Respondents-Appellants. |
| District & No. | First District, Third Division<br>Docket Nos. 1-09-3547, 1-09-3549 |
| Filed | November 16, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendants' convictions for indirect criminal contempt based on their violation of a housing court's orders requiring defendants to vacate portions of a two-story building they rented for the operation of restaurants and nightclubs were reversed and their sentences were vacated, notwithstanding the fact the portions of the building at issue were being used at the time of an incident in which numerous people were killed and injured while attempting to leave the building, since the formal order concerning the prohibited use of the building was ambiguous to the extent that it did not describe in reasonable detail the acts prohibited, there was no evidence defendants agreed that their nightclub would be closed, the city issued a liquor license to the nightclub as proceedings in the housing court continued, and the violations of the housing court order had nothing to do with the deaths and injuries that occurred. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 03-MC1-19280102, 03-MC1-19280103; the Hon. Daniel J. Gillespie, Judge, presiding. |

| Judgment | Reversed and vacated. |
| --- | --- |

| Counsel on Appeal | Abishi C. Cunningham, Jr., Public Defender (Lester Finkle and Vicki Rogers, Assistant Public Defenders, of counsel), and Victor P. Henderson, Christopher W. Carmichael, Chelsea A. Ashbrook, and Darren H. Goodson, all of Holland & Knight, LLP, both of Chicago, for appellants. |
| --- | --- |
| | Stephen R. Patton, Acting Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Kerrie Maloney Laytin, Assistant Corporation Counsel, of counsel), for appellee. |

| Panel | JUSTICE MURPHY delivered the judgment of the court, with opinion. Presiding Justice Steele and Justice Quinn concurred in the judgment and opinion. |
| --- | --- |

**OPINION**

¶ 1    This appeal relates to indirect criminal contempt proceedings against respondents, Calvin Hollins, Jr., and Dwain J. Kyles, for the failure to comply with a July 19, 2002, "mandatory order" in the underlying suit alleging building code violations at 2347 South Michigan Avenue, Chicago, Illinois. In particular, petitioner City of Chicago (City) alleged the second floor of the building that housed the "E2" nightclub and a second floor or mezzanine with VIP rooms in that area was dangerous. Tragically, in the early morning hours of February 17, 2003, a fight broke out at the nightclub and after security guards utilized pepper spray in an attempt to control the situation, the crowd panicked and 21 people were killed in a stampede to leave the club.

¶ 2    On the next day, February 18, 2003, the City filed the underlying petition for adjudication of indirect criminal contempt. The City alleged that respondents had been ordered not to occupy the second floor of the building. The City asserted that if respondents had been acting in compliance with that order, there would not have been 21 dead and 50 injured patrons. There was no explanation as to how the building code violations related to the actual incident and tragic deaths and injuries.

¶ 3    Respondents appeal that judgment and their respective sentences of two years' imprisonment. Respondents assert that the trial court erred in instructing the jury on vicarious corporate liability and failing to include a definition on willfulness. They also contend that the trial court improperly barred admission of certain evidence key to respondents' assertion that the trial court's order was ambiguous and there was no willful violation of that order.

In particular, respondents argue that the trial court's half sheet and a letter from respondents' attorney at the hearing explaining the trial court's order should have been admitted. Finally, they argue that at sentencing the trial court improperly considered factors unrelated to the contempt charges and for which respondents were acquitted at a separate criminal trial. Respondent Hollins also argues that the City improperly brought out evidence of his character and past bad acts even though he did not testify or otherwise put his character into issue. For the following reasons, we reverse the trial court and vacate respondents' sentences.

¶ 4                                    BACKGROUND

¶ 5        This matter involves allegations that respondents willfully violated orders of the housing court to vacate portions of the two-story building located at 2347 South Michigan Avenue, Chicago, Illinois. The two-story building was originally constructed to house an automobile dealership and consisted of several levels. Prior tenants of the building had constructed and utilized the mezzanine level of the second floor for auto parts storage.

¶ 6        Respondents began renting the building in the 1980s and operated various restaurants and nightclubs in that location up to, and including, the date of the tragedy. In approximately 1990, respondents remodeled the mezzanine level, which was suspended above the floor of the nightclub by trusses connected to the ceiling of the building, to create a VIP area. Around 1999, respondents remodeled the building and re-opened with the first floor housing a restaurant called Epitome and, on the second floor, respondents operated a nightclub called Epitome 2 Nightclub or "E2." E2 consisted of a main dance floor, two bar areas and the aforementioned mezzanine level with several VIP rooms hanging over the dance floor. In 2001, respondents again remodeled the mezzanine, this time utilizing the trusses to create natural separation for several VIP rooms. Epitome and E2 were operating in the building in this condition on all of the dates in question in the instant matter.

¶ 7                         Building Code Enforcement Proceedings

¶ 8        On June 18, 2002, the City filed a building code enforcement action in housing court against the owner of the building, Lesly Motors, Inc. The operator of the restaurant and nightclub, Le Mirage, Inc., voluntarily allowed itself to be impleaded into the action. Respondent Kyles was named as Le Mirage's sole shareholder, and respondent Hollins was named as Kyles' "silent partner." The City sought an injunction requiring respondents to correct 11 code violations all related to the second-floor mezzanine and VIP area. The City alleged that this suspended mezzanine and VIP area had been built without proper permits and that the partitions could not support its weight, creating dangerous conditions for the nightclub.

¶ 9        On July 19, 2002, the parties entered their first appearance before the court, Judge Daniel Lynch presiding. Edward J. Morris appeared on behalf of Lesly Motors. Le Mirage's regular attorney, Thomas Royce, was on trial in Will County and could not appear so Bradley Prendergast, Royce's officemate, appeared in his stead.

¶ 10       At the hearing, Prendergast waived service of summons on behalf of Le Mirage. Assistant corporation counsel Demetrius Kare stated that the City had cited several violations

-3-

"pertaining to the second-floor VIP rooms attached to this nightclub" and that was the immediate concern at that time. Kare presented what he described as an "agreement that LeMirage, Incorporated agrees not to occupy the second-floor VIP rooms."

¶ 11　　Judge Lynch then heard testimony from the City's building inspector, Margarite Shahi. Shahi testified that the entire second floor was dangerous due to, *inter alia,* the weight of the VIP rooms suspended from the bow truss roof and that substandard partitions were used to build the VIP rooms. At the conclusion of the testimony, the trial court stated: "Your agreement is no occupancy of the second floor. You have to keep it vacant." Judge Lynch then wrote the following note on the half sheet: "BA Mirage will not occupy 2d Floor VIP rooms" (hereinafter, half sheet order).

¶ 12　　After the hearing, Prendergast sent a letter to Royce to report on the proceedings before the court on July 19, 2002, as follows:

"The city inspector testified that the sky-boxes on the second floor overlooking the dance floor are dangerous and hazardous because they are suspended from the trust-roof [*sic*] ***. The judge entered an Order that the second floor mezzanine not be used, the VIP room, until there is a hearing. As a result, they are now 'vacant' important persons rooms. That order will remain in effect until August 9th."

¶ 13　　Prendergast received a facsimile of the written order of July 19, 2002 (hereinafter, formal order), signed by Judge Lynch, several days after the hearing. He forwarded the formal order to Royce. The formal order did not specify whether it applied to the second floor of the building or of the nightclub, and simply provided: "Mandatory order not to occupy 2d floor."

¶ 14　　On August 9, 2002, Kare appeared in court on behalf of the City and Royce appeared on behalf of respondents as well as for Lesly Motors. Kare asked that the formal order be continued to September 6, 2002, and requested an order of interior inspection. After the trial court inquired whether there were any dangerous or hazardous conditions, the following exchange occurred:

"MR. KARE: I may call the inspector if the Court wishes to hear anything further.

THE COURT: Other than the second floor, which has been addressed by the agreement not to occupy?

MR. KARE: Right, and the mezzanine that–the V.I.P. rooms is alleged in our complaint.

MR. ROYCE: We've agreed to that your Honor. We've taken steps and I believe yesterday there was a meeting and it wasn't resolved to the City's satisfaction. I spoke to them last evening–begin the structure swelling, pulling permits. With that in mind we needed additional time. I was asking counsel for additional time.

THE COURT: September 6th.

MR. ROYCE: Yes your Honor.

THE COURT: Is that the return date?

MR. KARE: Yes your Honor.

THE COURT: Matter for conference September 6th, and in particular the dangerous, haz[a]rdous condition relates to the structure of the second floor?

-4-

MR. KARE: Pertains to the V.I.P. rooms and mezzanine.

THE COURT: It's the structure?

MR. KARE: We don't know if there's no plans or permits on file. We don't know if they can support the weight, these people occupying the second floor.

THE COURT: This is the floor that's supported by the roof trusses?

MR. KARE: That's correct.

MR. ROYCE: No one has been in the premises since, other than employees and workers. They won't go up there."

¶ 15    The court entered an order continuing the matter to September 6, 2002, and ordering: "Mandatory order not to occupy 2nd floor of subject premises." At the September 6, 2002, hearing, Kare, Shahi and counsel for Lesly Motors appeared. Despite filing a motion to vacate the formal order, the motion was not served on the City and Royce and the respondents did not appear at the hearing. Kare filed a petition to show cause based on Shahi's inability to gain access to the building for an inspection. The trial court entered an order stating: "(1) Defendant, Le Mirage, Inc., motion to vacate the order of July 19, 2002, requiring that said defendant not occupy the 2nd floor and mezzanine is stricken, and (2) All previous orders remain in full force and effect."[1]

¶ 16    At the next hearing on October 25, 2002, the parties had reached agreement for an inspection of the building and the petition for rule to show cause was withdrawn. Kyles agreed to continue the prior order. The City confirmed that the order was to "not to occupy the second floor, mezzanine and VIP rooms." The trial court's order of that date provided: "[A]ll prior orders to remain in full force and effect." The matter was continued to March 7, 2003, for trial, settlement or dismissal.


¶ 17                    The E2 Tragedy and The City's Petition

¶ 18    Respondents continued to operate the E2 nightclub on the second floor of the building throughout the instant proceedings. During the early morning of February 17, 2003, a fight ensued on the E2 dance floor. Security guards utilized pepper spray to break up the altercation. The patrons of the club panicked, some reporting that they heard someone yell "terrorist attack" or "anthrax" as the crowd fled for the doors. Tragically, in the rush to escape the smog of pepper spray, the patrons manifested into a stampede and crowded into a narrow staircase to reach the first-floor exit. As a result of the stampede, 21 patrons were crushed and killed in the charge and 50 other patrons were injured.

¶ 19    On February 18, 2003, the following day, the City filed a three-page, single-spaced petition for adjudication of indirect criminal contempt against Le Mirage and Kyles. The City alleged that respondents opened the E2 premises in entirety. It asserted that this was in violation of the formal order and 21 people died as a result.

¶ 20    On July 10, 2003, the City amended the petition. The City had determined that Hollins

---

[1]This order is of record; however, as addressed by this court in *People ex rel. City of Chicago v. Hollins*, 368 Ill. App. 3d 934, 938 (2006), no copy of respondents' motion is of record.

was a partner in Le Mirage and added Hollins as a party while omitting Le Mirage as a party. The City also added several excerpts from the hearing transcripts where the parties discussed the alleged violations and the formal order. The City filed it's third amended petition on January 27, 2005. In this 10-page final petition, the City added detail on proposed witnesses and expected testimony to be presented at trial in support of its claim that respondents violated the formal order.

¶ 21                         Criminal Charges and Proceedings

¶ 22      Respondents were acquitted of charges filed by the State's Attorney, asserting 63 counts of involuntary manslaughter related to the 21 deaths. As part of those proceedings, this court affirmed the trial court's order granting respondent Kyles' motion to bar evidence or testimony that E2 was supposed to be closed on the night of February 17, 2003, and that structural defects existed in the building. This court agreed with the trial court's conclusion that the structural defects had "nothing to do with the cause or manner of death of the individuals here." Accordingly, we found that the building code violations for the structural defects and resulting order were not relevant to the question of whether defendant consciously disregarded a substantial and unjustifiable risk when he continued to operate the nightclub. *People v. Kyles*, No. 1-07-0284 (2008) (unpublished order pursuant to Supreme Court Rule 23).

¶ 23           Prior Proceedings on Petition for Indirect Criminal Contempt

¶ 24      On February 1, 2005, in the first proceedings on the instant petition for indirect criminal contempt proceedings, Judge Lynch presided over a jury trial in housing court. However, a mistrial was declared based on the prosecution's improper comment on what the defense would be during opening arguments. This court considered and rejected respondents' contention that the proceedings should be dismissed on the ground that double jeopardy barred retrial because the City intended to provoke the mistrial. *People ex rel. City of Chicago v. Hollins*, 368 Ill. App. 3d 934, 941-46 (2006). For retrial, respondent Kyles' contention that Judge Lynch was a potential witness and should be disqualified on remand was accepted, with Justice Campbell noting for the panel:

     "We find Kyles' argument compelling and do not agree that Kyles is requesting a review of prior nonfinal judgments. From the record, it appears that the interpretation of the original order and the subsequent orders regarding the closing of either the E2 VIP rooms or the second floor or both may become an issue at trial and that Judge Lynch had personal knowledge of disputed evidentiary facts. As such, it would be improper for Judge Lynch to continue to preside over this case." *Id.* at 947-48.

As such, this court recognized that the prior orders and the underlying hearings before Judge Lynch might be crucial issues on remand.

¶ 25                              Pretrial Motions

¶ 26      The matter was transferred to a new judge, and prior to the instant trial, the court heard

-6-

numerous motions *in limine*. Of note are the motions by the Attorney General on behalf of Judge Lynch to quash the subpoena for him to testify and by the City to exclude testimony concerning the half sheet entries by Judge Lynch and introduction of the half sheet as evidence. The trial court found that the formal order was clear and unambiguous on its face. Therefore, it granted the motion to quash because it would be improper for Judge Lynch to testify about his mental processes behind the order. Also, because the trial court concluded that the formal order controlled, discussion of the half sheet would be irrelevant and confusing to the jury.

¶ 27                    Retrial on the Third Amended Petition

¶ 28    At retrial, the aforementioned facts concerning the building inspection, code violations and housing court proceedings were presented by various witnesses. Shahi testified that building inspectors do not close businesses, but that she had requested the whole second floor remain vacant due to the concern that the construction of the mezzanine and VIP rooms could have damaged the roof so badly as to cause harm to occupants of the second floor. Shahi acknowledged that discussions in court centered on closing the VIP area and not the entire second floor.

¶ 29    Shahi testified that on October 23, 2002, she and Julio Montilla, a building inspector for the City, met Hollins and two engineers at the building. They explained the violations and when in the VIP rooms explained that they were not to be used. Montilla signed his name on a napkin and placed it underneath a glass on a table in the VIP room and stated that when they returned that they would know if the VIP rooms had been in use. Hollins stated that he understood. Montilla testified that the comments were intended to mean that the whole second floor was not supposed to be used.

¶ 30    Kare testified that the July 19, 2002, order was drafted by a law clerk for the City. Kare maintained, contrary to his statements in court at the 2002 hearings, that the scope of the order was not limited to the VIP rooms and mezzanine, but included the entire second-floor nightclub area. Kare testified that the original agreement was to enter an agreed order closing the mezzanine and VIP room. However, after Shahi's testimony, the extent of the closure was changed to include the entire second floor.

¶ 31    Several patrons of the nightclub testified that they were able to gain entry to the mezzanine and VIP area from July 19, 2002, up to and including February 16, 2003. Testimony was provided that there were no ropes or signs prohibiting access to the VIP rooms. A security officer, who worked for a third party, also testified that he did not prevent access to this area and that patrons utilized the VIP rooms. None of these witnesses recalled seeing respondents at the nightclub.

¶ 32    Chicago police officer John Lucki testified that he interviewed respondents on February 17, 2003. Respondents informed Lucki that E2 security was present on the ground floor for events, but a third-party group promoted and booked engagements at the club and provided the security in the nightclub area. Respondents did not indicate there were any issues with the building.

¶ 33    Prendergast testified that he understood that the agreement reached on July 19, 2002, was

that the VIP rooms would not be occupied and there was no mention that the nightclub would be closed by any of the parties or the trial court. Prendergast explained that he did not cross-examine any witnesses concerning the issue because he believed that there was no dispute regarding the scope of the agreed order. However, he conceded an order signed by a judge controls and the judge reserves the right to modify the order.

¶ 34 Prendergast also testified that he did not object when Judge Lynch stated that the agreement was no occupancy of the second floor, but that he believed that the reference of the second floor was to the VIP rooms. Again, he testified that this was because he did not believe there was any dispute that the order would only bar use of the VIP rooms. He explained that he left prior to receiving the order, but stated this was typical practice. Further, he noted that he dictated the short letter to Royce to detail the proceedings that day.

¶ 35 Royce testified that when he received the letter and order he became concerned and went to review the half sheet. Because the half sheet was consistent with the letter from Prendergast, the parties had an agreement, and Kare had noted himself to the court that the order pertained to the VIP rooms and mezzanine, he did not raise the inconsistency in the court's order. Furthermore, no one with the City had told him that the nightclub had to be closed, so Royce advised respondents that the VIP rooms were the problem and that area had to be taped or roped off and remain vacant. Royce admitted that allowing occupancy of the VIP rooms and mezzanine would constitute a violation of the order as he understood the order.

¶ 36 Respondent Kyles testified on his own behalf. Respondents worked with an event planner who rented the nightclub weekend nights and provided its own security. Kyles testified that he hired his own security to check identification at the door. Royce informed Kyles that the VIP rooms had to be closed and he informed staff. After putting up a sign and a rope in front of the VIP entrance failed to keep patrons out, a security person was placed at the entrance to prohibit access.

¶ 37 Kyles testified that at the October 25, 2002, hearing he presented a structural engineer report that demonstrated that the loads on the mezzanine were safely supported. While Kyles testified that he thought the parties had reached a compromise, he informed the trial court that he understood the prior orders were to remain in effect. He testified that the nightclub continued to operate and host events. Further, Kyles testified that he renewed the nightclub's business and liquor licenses with the City in November 2002.

¶ 38 Kyles testified that he considered respondent Hollins a partner, but he was officially considered a consultant to the business. Kyles knew that Hollins was legally ineligible to be a manager of a bar and that is why he was listed as a consultant. Following objection by respondents, based on the pretrial order barring evidence of Hollins' prior conviction for manslaughter, counsel did not mention "manslaughter," but simply said "legally ineligible" and questioning continued with respect to a liquor commission proceeding involving respondents. Kyles testified that, after a hearing, his liquor license was not revoked.

¶ 39 Jury Instructions and Verdict

¶ 40 During the jury instruction conference, respondent Hollins requested that an instruction

-8-

defining "willful" be given. The City argued that no definition was necessary for willful as it was a commonly understood term. Counsel for Kyles stated that he supported use of the Black's Law Dictionary definition of the term, but stated that he preferred going without it rather than using the pattern instruction for the term. Hollins' attorney conceded.

¶ 41 Following extensive discussion concerning the instruction for the elements of indirect criminal contempt, the court instructed the jury as follows on this issue:

"A person commits an offense of indirect criminal contempt when he willfully violates a valid court order.

To sustain the charge of indirect criminal contempt, the City must prove the following proposition, first, there was an order reduced to writing signed by the Judge and entered of record; second, that the order described in reasonable detail the acts prohibited; third, that the Respondent received actual [notice] of the order by personal service or otherwise; and four, that the Respondent willfully violated said order.

If you find from your consideration *** of all the evidence that each one of these propositions had been proved beyond a reasonable doubt, you should find the Respondent guilty."

¶ 42 During deliberations, the jury sent a request to the trial court for the legal definition of "willfully." The court responded with a note to the jury that it had should continue to deliberate as it had "received all the instructions and evidence the Court has admitted." The jury returned guilty verdicts against both respondents.

¶ 43 Posttrial Motion and Sentencing

¶ 44 Respondents both filed motions for judgment notwithstanding the verdict or a new trial. They argued that the trial court should have granted respondents a directed verdict because the orders at issue were vague. Respondent Kyles added argument that the comments from Kare, Shahi and the trial court, in addition to the wording of the formal orders and half-sheet order, added to the confusion concerning the scope of the orders. Because of this, he argued the City changed its theory mid-trial that the orders applied only to the mezzanine area and this not only confused the jury, but led to the City's failure to prove a willful violation of the trial court's order. Respondents advanced several additional arguments, including assertions of numerous errors by the trial court in allowing or barring evidence and in instructing the jury.

¶ 45 At sentencing, the trial court first denied respondents' posttrial motions. The court heard extensive testimony and argument in aggravation and mitigation, including 10 mitigation witnesses. In aggravation, the City argued that respondents did whatever they had to do to keep the nightclub open and "because of their willful and wanton violations of the court orders we have 21 people dead."

¶ 46 The trial court noted that it had never heard as much testimony in mitigation as in this case and that it had a significant effect. It stated that it seriously considered probation, but determined that probation would "deprecate[,] under all the facts and circumstances of this case, [the] serious nature of this matter." Because a jury had found respondents guilty beyond

a reasonable doubt of the conscious and willful disregard of the court's orders for an extended period of time, it concluded:

> "Court orders must be respected and obeyed. The City had asked for three years, recommended a sentence of three years before the case went to trial. After trial the City had asked for five years. And that was not an unreasonable request under all the facts and circumstances. However, it is the belief of this court that justice should be tempered with mercy. And if there was ever a case where justice should be tempered with mercy, it would be this case, accordingly, [it is] the sentence of this court that each defendant be sentenced to two years in the Illinois Department of Corrections."

¶ 47                                                    ANALYSIS

¶ 48    Contempt adjudications are an important tool inherent in the powers of the court. This power is utilized as an essential component in the administration of judicial power. *People v. Martin-Trigona*, 94 Ill. App. 3d 519, 522 (1980). However, without legislative or defined authority, these proceedings are *sui generis* and with the differences between the various categories of contempt–civil and criminal, direct and indirect–there is often confusion and a lack of authority to provide guidance. For an excellent and comprehensive review of contempt proceedings that reads more like a treatise than an opinion, we urge review of *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43-60 (1990), from the Fourth District of this court. For the resolution of this matter, we are concerned only with indirect criminal contempt and refer only to that area of the law.

¶ 49    Criminal contempt is punitive in nature and retrospective, punishing a party for either doing what was prohibited or failing to do what was ordered. *People v. Covington*, 395 Ill. App. 3d 996, 1006 (2009). The judicial contempt power is powerful in nature and serious penalties may be imposed under that power. *O'Leary v. Allphin*, 64 Ill. 2d 500, 513 (1976). The rationale for imposing punishment is the same as for misdemeanor criminal proceedings–retribution, deterrence, and vindication of the norms of socially acceptable conduct ((1) respect for judges and court officials in the administration of their duties; (2) orderly judicial proceedings; (3) obedience of court orders; and (4) not committing fraud upon the courts). *Betts*, 200 Ill. App. 3d at 44-45.

¶ 50    By definition, indirect as opposed to direct criminal contempt is based on action or inaction outside the purview of the court and requires proof of the respondent's violation of the court's order. A party charged with indirect criminal contempt who faces a possibility of more than six months in jail and a fine is afforded constitutional protections afforded to any other criminal defendant, including a jury trial. *Id.* The respondent is entitled to know the nature of the charge or charges against him, to have those charges definitely and specifically set out within a citation or rule to show cause, and to have the opportunity to answer. *Id.* at 58. Naturally, the respondent has the privilege against self-incrimination, is presumed innocent, and must be proved guilty beyond a reasonable doubt. *Id.*

¶ 51    Ultimately, two elements must be proven beyond a reasonable doubt by a petitioner to sustain a charge of indirect criminal contempt: (1) the existence of a valid court order; and (2) willful violation of that order by the respondent. *City of Rockford v. Suski*, 307 Ill. App.

3d 233, 245 (1999). Because of the liberty concerns addressed above that are implicated in contempt proceedings and because contempt is such a drastic remedy, the underlying order must set forth "with certainty, clarity and conciseness precisely what actions are enjoined." *O'Leary*, 64 Ill. 2d at 514. Accordingly, the valid court order " 'must be clear before disobedience can subject a person to punishment.' " *Id.* (quoting *People v. Wilcox*, 5 Ill. 2d 222, 228 (1955)). On appeal, a reviewing court views the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could have found the elements were proved beyond a reasonable doubt. *Suski*, 307 Ill. App. 3d at 247-48. However, where a court of review is of the opinion that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, it must reverse the conviction. *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 52       The City adds that, as with any criminal matter, the relative weight and credibility given to testimony is within the province of the trier of fact. *Suski*, 307 Ill. App. 3d at 248 (citing *People v. Smeathers*, 297 Ill. App. 3d 711, 717 (1998)). The City asserts that this court should reverse a finding of contempt only if the verdict is against the manifest weight of the evidence or the record reflects an abuse of discretion. *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984). It argues that this strict standard is highlighted by this court's pronouncement that a "trial court's finding of willful contempt will not be disturbed on appeal unless there is a clear abuse of discretion." *Suski*, 307 Ill. App. 3d at 248 (citing *Smeathers*, 297 Ill. App. 3d at 717).

¶ 53       Prior to considering the parties' arguments, we must address the standard of review, as it is central to our disposition. First, unlike the instant matter, *Logston* involved an adjudication for civil contempt for failure to pay maintenance pursuant to a judgment of dissolution and was not a criminal contempt case and the City's reliance on that case is misplaced. However, both *Suski* and *Smeathers* involved criminal contempt adjudications and also advanced this standard of review, with *Suski* citing *Smeathers* for support. The City correctly cites these cases and provides further support for our contention above concerning the various levels of confusion and lack of guidance in the application of contempt law.

¶ 54       Tracking the support from these cases reveals the courts' error and supports our departure from these decisions. As noted, *Suski* cited to *Smeathers* for this contention, which also cited to an indirect criminal contempt case in support. *Smeathers*, 297 Ill. App. 3d at 716 (citing *In re Marriage of Madary*, 166 Ill. App. 3d 103, 106 (1988)). The *Madary* court properly cited an indirect criminal contempt case itself. *Madary*, 166 Ill. App. 3d at 106 (citing *People ex rel. Hartigan v. Jansen*, 151 Ill. App. 3d 208, 210-11 (1986)). However, the *Jansen* court improperly established this standard of review by following a ruling in a civil contempt case. *Jansen*, 151 Ill. App. 3d at 213 (citing *Frank B. Hall & Co. v. Payseur*, 99 Ill. App. 3d 857, 860 (1981)). As addressed above, the differences between the types of contempt require distinct approaches and case law regarding each area is often distinguishable.

¶ 55       It is well established that criminal sanctions and deprivation of liberty require the protection of due process, and in this context, proof beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 317-19 (1979). While the abuse of discretion and manifest weight of the evidence standards may apply to civil contempt findings and ancillary matters such as evidentiary rulings in criminal cases, the ultimate standard of review requires proof beyond

a reasonable doubt. Accordingly, we disagree with *Suski* and its predecessors to the extent those cases deviate from this standard.

¶ 56    With respect to the merits of the case, respondents advance three issues to support their claims for reversal. However, because we agree that the formal order was ambiguous and did not provide in reasonable detail the acts prohibited, we need only discuss this issue. In doing so, we reverse the indirect criminal contempt adjudications against respondents and vacate their sentences.

¶ 57    The City contends that the plain and simple language of the formal order controls and the jury properly found that the evidence at trial supported the charge that defendants willfully violated the clear command of the formal order. The City argues that this is true especially viewing the evidence in a light favorable to the prosecution. It concludes that, limiting our review to the four corners of that document, there can be no reading of the formal order other than that the entire nightclub was closed and the contempt adjudications must be affirmed.

¶ 58    We disagree with the City. The City correctly cites *City of Chicago v. American National Bank & Trust Co. of Chicago*, 171 Ill. App. 3d 680, 685-86 (1988), for the proposition that a written order takes precedence over the half sheet and if it is plain and unambiguous, it controls. We also agree with the trial court and the City that the sanctity of court orders and the power of the court are essential and contempt proceedings are sometimes necessary. Of course, we also agree that the events at the E2 nightclub were indeed a horrific tragedy and actions to administer justice or prevent a similar tragedy in the future are warranted. However, simply, under the facts of this case, we disagree that the formal order was as clear and unambiguous as the City maintains and the law requires.

¶ 59    In order to find the defendants guilty of indirect criminal contempt, the trial court instructed the jury that it would have to find beyond a reasonable doubt that "the order described in reasonable detail the acts prohibited." While this is an issue of fact requiring deferential review, whether a court order is sufficiently detailed is a matter with which courts of review are extremely familiar. Where we are not convinced that this element has been proven beyond a reasonable doubt, we are obligated to reverse the convictions. *Smith*, 185 Ill. 2d at 541.

¶ 60    We are presented on appeal with a vast amount of evidence showing that the parties and the trial court each were under a different understanding of the allegedly unambiguous formal order stating "Mandatory order not to occupy 2d floor." The contemporaneous and subsequent in-court statements by the trial court, the parties, and the City's attorneys and experts do not support the City's position that it was the clear command of the trial court that the entire nightclub was to remain vacant.

¶ 61    At first blush the language appears clear; however, a review of the record before this court reveals that the City's law clerk should have included three words following "Mandatory order not to occupy 2d floor" in the formal order–either "of the building" or "of the nightclub." Contrary to the City's assertion that, if confused, respondents should have sought clarification of the formal order, this action is criminal in nature and the City faces the burden of proving beyond a reasonable doubt that the underlying order set forth "with certainty, clarity and conciseness precisely what actions are enjoined." *O'Leary*, 64 Ill. 2d

at 514.

¶ 62     While some of the comments of record may be construed in the manner the City maintains, the majority of testimony and queries seeking clarification of the City's concerns with the building all related to the closure of the portion of the structure attached to the roof trusses–the mezzanine and VIP rooms. It is telling that, after receiving clarification from counsel, the trial court indicated on its half sheet that the parties agreed to vacate the "2d floor VIP rooms" after the July 19, 2002, hearing. Further, the trial court again sought clarification of the extent of the City's concerns during the August 9, 2002, hearing and the City attorney affirmed that the VIP rooms and mezzanine–the floor supported by the roof trusses–was the concern. Subsequent statements by the parties and the trial court further support this contention.

¶ 63     Additionally, the formal order was entered by agreement of the parties. There is absolutely no evidence to support the notion that respondents agreed that the nightclub would be closed. On the contrary, it is evident that respondents did not agree to close the entire nightclub as they maintained operations. Further, the City issued a liquor license to the nightclub as proceedings continued in housing court as the City inspected the structure and respondents enlisted the services of a structural engineer.

¶ 64     Following the City's authority in *City of Chicago*, we note that a circuit court order must be interpreted in its entirety, including reference to the record. *City of Chicago*, 171 Ill. App. 3d at 687. Reviewing the formal order, as well as the transcripts of the hearings and other evidence of record, the formal order is insufficient to support a finding of indirect criminal contempt beyond a reasonable doubt. We are unaware, and the City admitted it was also unaware, of any cases from building court on point with the instant matter that resulted in a finding of indirect criminal contempt and prison sentence rather than findings for civil contempt for violation of prospective orders or civil fines. The City has taken the position that, at its sole discretion, an untold number of building code violation cases or other simple orders could be read to result in criminal prosecution and possible prison sentences. Because of this, the requirement of an order clearly defining what actions are required or barred is essential to the proper adjudication of indirect criminal contempt.

¶ 65     We understand the horrible tragedy involving the E2 nightclub and do not wish to diminish the seriousness of that incident. Nor do we minimize the need to assure that buildings are maintained according to the building code to avoid any undue harm. We also completely understand the absolute need for orders of the court to be respected and obeyed. However, we agree with the *Hollins* court's finding that the violation of the building court order had nothing to do with the tragedy. Further, the court's inherent power to adjudicate a party in contempt is wisely constricted by the elements requiring a specific order and willful violation of that order. Because we have found there was not a sufficiently specific order in this case, we reverse respondents' adjudications and vacate their sentences.

¶ 66                                   CONCLUSION

¶ 67     For the foregoing reasons, the judgment of the trial court is reversed and respondents' sentences are hereby vacated.

¶ 68        Reversed and vacated.