NOTICE
Decision filed 12/12/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 231192-U

NO. 5-23-1192

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Clinton County. |
| | ) | |
| v. | ) | Nos. 20-CF-94, 21-CF-231, |
| | ) | 20-CM-223, 20-CM-234, |
| JOSHUA BONE, | ) | 21-CM-18 |
| | ) | |
| Defendant | ) | |
| | ) | |
| (Illinois Department of Human Services | ) | |
| and Grace Hou, Secretary of the | ) | Honorable |
| Illinois Department of Human Services, | ) | Joshua C. Morrison, |
| Contemnor-Appellants). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice McHaney and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the trial court found a party in indirect civil contempt after that party had already complied with the underlying order and where the party was required to do more than comply with that order to purge the contempt, the court's order was, in substance, an order for indirect criminal contempt. Where the contemnor was not afforded most of the procedural due process rights required in criminal proceedings, we must reverse the court's contempt order.

¶ 2    The defendant, Joshua Bone, was found unfit to stand trial. The Illinois Department of Human Services (DHS) was ordered to evaluate him and admit him to a secure facility for treatment within 60 days. Because DHS missed this deadline, the Clinton County State's Attorney filed a petition for a rule to show cause why DHS should not be held in contempt for failing to

1

comply with the court's order. The defendant was admitted to a DHS facility nine days later. The court subsequently found DHS to be in contempt. Rather than impose sanctions immediately, the court set the matter for another hearing and indicated that it would vacate the contempt finding if DHS could demonstrate "real improvement" in the ongoing problem of significant waiting time for admissions. After the second hearing, the court declined to vacate the finding of contempt and ordered DHS to pay a fine to Clinton County based on the 88 days the defendant spent in the Clinton County jail awaiting transfer to a facility for treatment. DHS appeals, arguing that (1) the court improperly imposed indirect criminal contempt sanctions on it without providing the required procedural protections; (2) the court's finding of a willful failure to comply with its order was against the manifest weight of the evidence; and (3) the court improperly awarded damages to the opposing party. We reverse.

¶ 3                                  I. BACKGROUND

¶ 4        In November 2021, the defendant was charged by information with aggravated battery (720 ILCS 5/12-3.05(a)(5) (West 2020)). In February 2022, the court appointed Dr. Daniel Cuneo to determine whether the defendant was fit to stand trial. The court found the defendant unfit to stand trial after a hearing on April 28, 2023. In its written order, the court directed DHS to (1) evaluate the defendant to determine the best secure facility for him; (2) admit him within 60 days of receiving the court's order; and (3) file a report with the court within 30 days after admitting him. See 725 ILCS 5/104-17(d), (e) (West 2022). DHS apparently received the order two days later.[1]

¶ 5        After an initial evaluation, DHS determined that Alton Mental Health Center (Alton) was the most appropriate facility for the defendant. However, the defendant was not admitted to Alton

---

[1]During the contempt hearing, a DHS witness noted that the order was received on May 30, 2023. However, based upon the arguments and assertions by both parties concerning the length of time it took for the defendant to be admitted, it appears that she meant to say the order was received on April 30.

2

within 60 days after receipt of the court's order. In addition, DHS did not file a timely motion requesting a 30-day extension of the 60-day deadline. See *id.* § 104-17(b).

¶ 6    On July 17, 2023, the Clinton County State's Attorney's office filed a petition for a rule to show cause. The petition asked the court to issue a rule ordering DHS Secretary Grace Hou and DHS to show cause why they should not be held in indirect civil contempt for failure to comply with the court's order to admit the defendant to a facility. The court issued an order for a rule to show cause that day and set the matter for an August 25 contempt hearing.

¶ 7    Nine days later, on July 26, 2023, the defendant was transferred to the custody of DHS and admitted to Alton. DHS filed a 30-day fitness report with the court on August 2, 2023, and a 90-day fitness report on August 23, 2023. The 90-day fitness report indicated that the defendant was fit to stand trial at that time. On the same day, DHS filed a motion to vacate the rule to show cause, arguing that the petition for rule to show cause should be denied based upon DHS's subsequent compliance with the court's order to admit the defendant.

¶ 8    The matter came for a scheduled contempt hearing two days later, on August 25, 2023. At the outset, DHS argued that the court should grant its motion to vacate the rule to show cause order, explaining that a finding of indirect civil contempt would be inappropriate because civil contempt sanctions are intended to compel performance, not to punish past conduct. The court responded, "I'm not dismissing that. Actually, I'm going to hear some testimony. So call your first witness."

¶ 9    Dr. Rupa Maitra, the medical director of Alton, testified on behalf of DHS. She stated that after an initial evaluation, conducted at the Clinton County jail, the defendant was placed on a waiting list for placement at Alton. She explained that admission depends "on the availability of a bed in [the] system." Dr. Maitra further explained that Alton generally admits patients in the order

of the dates on their orders for treatment but that a patient who is "decompensating in the jail" must be prioritized. Asked if she was aware of "any willful disregard" of orders for treatment, Dr. Maitra replied, "We have never disregarded. We have always respected and tried to best accommodate the admission as soon as we can."

¶ 10    On cross-examination, Dr. Maitra testified that the availability of staff and the availability of beds are both considerations in how quickly a new patient can be admitted. She noted that although Alton's beds are ordinarily all occupied, some beds may remain empty if there is insufficient staff to care for additional patients. She testified that when a patient is discharged, a new patient is admitted immediately as long as there is adequate staff available.

¶ 11    Dr. Maitra testified that DHS was "working diligently to increase the beds." She explained that there had been a 40 to 50% increase in the number of referrals since before the covid pandemic. Asked how many people were on Alton's waiting list "at any given time," she replied that at the time of the hearing, there were 15 people on the waiting list, but that one of those patients would be admitted by the end of the day.

¶ 12    In response to questioning by the court, Dr. Maitra testified that there were 110 beds in Alton's forensic unit and 51 beds in its civil unit. Asked how many of these beds were empty, she indicated that 11 beds were empty, but that number would be reduced to 9 due to two planned admissions. She was not asked to specify how many of these beds were in the forensic unit. The court asked why there were empty beds when Alton had a waiting list. Dr. Maitra explained that there was a lack of sufficient staff. She acknowledged that although the court ordered the defendant to be admitted in April 2023, he was not admitted until July. In response, the court stated, "I find that completely unacceptable. A man spent two months in jail because you wouldn't take him."

We note that later in the hearing, the court clarified that the defendant waited for three months to be admitted to Alton, not two months.

¶ 13    DHS Secretary Grace Hou gave a statement under oath, but she was not questioned by the court or counsel for any party. She reiterated Dr. Maitra's testimony that DHS had experienced a "dramatic increase in the number of admissions" of patients into the forensic system. She stated that at the same time, DHS was "experiencing a workforce shortage." She emphasized that this was a nationwide problem and was not unique to Illinois. Secretary Hou outlined several steps DHS was taking to alleviate the delays, including (1) recruiting new staff, (2) contracting with "vendors and contractors" to provide additional staff, and (3) pursuing relationships with private hospitals that may be able to admit some forensic patients. She explained, however, that the third option was only possible for patients with "minimal security requirements." Finally, Secretary Hou testified that despite these challenges, DHS increased its system-wide number of staffed beds by 81 during fiscal year 2023.

¶ 14    In her closing argument, counsel for DHS recognized that it took 88 days from when DHS received the order for treatment until the defendant was admitted to Alton. She acknowledged that this delay was not ideal, but she argued that the delay was not willful. Rather, she contended, the testimony showed that DHS was "doing everything within its power to increase the number of beds and, more importantly, [to] increase the number of staff for those beds so they can safely admit." In response, the court stated, "I'm going to politely disagree with your assessment. This is clearly willful. By your own admission, within 10 days of my issuance of the rule to show cause, he was admitted to DHS. I do see a direct link to that."

¶ 15    The court went on to rule from the bench. The trial judge noted that, in his experience, wait time for admission to DHS had been a problem for the past 16 years. He opined that the fact that

5

Alton was able to admit the defendant within 10 days after entry of a rule to show cause indicated that a bed was available. The court found that DHS's failure to admit the defendant within 60 days pursuant to the order for treatment constituted willful conduct in blatant disregard of a court order. The court therefore found DHS and Secretary Hou in contempt of court. However, the court stayed the contempt order to give DHS an opportunity to improve its admission process. The court set the matter for another hearing and stated that he would vacate the contempt finding if he saw "real improvement" by that time.

¶ 16    The matter came for another hearing on October 27, 2023. The court began by asking counsel for DHS what had been done to solve the problem of long waits for admission. In response, counsel relied upon facts set forth in the written declaration of Dr. Sharon Coleman, the Deputy Director of Forensic Justice, a division within DHS. Counsel noted that, according to Dr. Coleman, DHS had increased its recruitment efforts and raised salaries to attract new employees, which allowed them to hire 2100 new employees. She stated that during 2023, Ingalls Mental Health Center had been able to increase its capacity by 12 staffed beds, Packard Mental Health Center had increased its capacity by 24 staffed beds, and Alton had increased its capacity by 22 staffed beds.

¶ 17    DHS argued that because the purpose of penalties for civil contempt was to compel future compliance, such penalties were inappropriate here because DHS had already complied with the court's order to admit the defendant. DHS further argued that civil contempt was also inappropriate in this case because it was impossible for DHS to comply with the court's order earlier due to the lack of an available staffed bed.

¶ 18    Counsel for the defendant argued that it violated the defendant's rights to be kept in jail for such a long period awaiting transfer. Counsel noted that this was especially true in light of the quick turnaround once the defendant was admitted to Alton.

¶ 19    In ruling from the bench, the court first agreed with defense counsel's argument. The court emphasized that the pertinent statutory provisions require DHS to admit a defendant found unfit to stand trial within 60 days unless the court grants an extension of up to 30 days. Here, the court noted, DHS admitted the defendant 28 days after the 60-day period had passed without seeking an extension. The court declined to vacate its earlier finding of contempt. As a sanction, the court ordered DHS to pay Clinton County $2200 for the 88 days the defendant was housed in the Clinton County jail before he was transferred to Alton. Addressing DHS's attorney, the court stated, "And Counsel, I will disagree with [your argument about] compelling future compliance. That is the entire point of making them pay for housing Mr. Bone."

¶ 20    At the request of the parties, the court then moved on to a fitness hearing, after which the court found the defendant fit to stand trial. On November 17, 2023, the defendant pled guilty. On November 21, DHS filed this timely appeal of the court's contempt order.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, DHS argues that (1) despite characterizing its contempt order as indirect civil contempt, in substance, the court imposed indirect criminal contempt sanctions; (2) the court failed to provide the required procedural protections before imposing criminal contempt sanctions; (3) the court's finding of a willful failure to comply with its order was against the manifest weight of the evidence; and (4) the court improperly awarded damages to the opposing party. We agree that despite the characterization as indirect civil contempt, the court's order was, in substance, an order for indirect criminal contempt. We further agree that the court did not afford DHS and

7

Secretary Hou the requisite procedural due process. Because we reverse on this basis, we need not consider the additional arguments.

¶ 23    Before addressing DHS's arguments, we note that neither the defendant nor the Clinton County State's Attorney's office has filed appellate briefs in this matter. We find, however, that the record in this case and the issues presented for our review are simple enough to allow us to resolve the claims raised without the aid of an appellee's brief. Thus, we may address those claims. See *First Capitol Mortgage Corp. v. Talandis Construction Co.*, 63 Ill. 2d 128, 133 (1976).

¶ 24    Turning our attention to the merits of DHS's contentions of error, we note that we will reverse a contempt order if we find that the trial court abused its discretion. We will find an abuse of discretion where no reasonable person could take the view adopted by the trial court or where the court committed an error of law in reaching its decision. *Door Properties, LLC v. Nahlawi*, 2023 IL App (1st) 230012, ¶ 25. We will also reverse the order if the court's factual determinations are against the manifest weight of the evidence. *In re Marriage of Weddigen*, 2015 IL App (4th) 150044, ¶ 22.

¶ 25    Courts have the inherent authority to impose sanctions for contempt of court, which is necessary to maintain their authority and the administration of their judicial powers. *Id.* ¶ 19 (citing *People v. Simac*, 161 Ill. 2d 297, 305 (1994)). Contempt proceedings are also a mechanism a court can use to enforce its orders. *In re J.S.*, 2022 IL App (1st) 220083, ¶ 70. Although the power to hold litigants in contempt is "vital to the administration of justice," it is "uniquely susceptible to abuse." *Door Properties*, 2023 IL App (1st) 230012, ¶¶ 26-27. This is because unlike in most areas of law, the legislature does not define the sanctionable conduct or set the penalties available for contempt. *Id.* ¶ 27. Instead, the judge presiding over contempt proceedings has sole discretion in " 'identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct.' " *Id.*

8

(quoting *International Union, United Mine Workers of America. v. Bagwell*, 512 U.S. 821, 831 (1994)). We remain mindful of this susceptibility in considering whether the court abused its discretion here.

¶ 26    Constitutionally mandated procedural requirements apply to contempt hearings. However, what requirements apply depends on the type of contempt involved. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 49-50 (1990). Contempt can be classified as either direct or indirect and as either civil or criminal. *Id.* at 43. Direct contempt involves conduct that occurs in the presence of the trial judge. *Id.* at 47. Indirect contempt, by contrast, involves conduct that does not take place in open court and facts of which "the judge does not have full personal knowledge." *Id.* at 48. As we will explain in more detail next, the primary difference between civil and criminal contempt is that civil contempt is intended to coerce compliance with court orders while criminal contempt is intended to punish past conduct. *Id.* at 43. We are not bound by the trial court's label of its contempt order. *SKS & Associates, Inc. v. Dart*, 2012 IL App (1st) 103504, ¶ 14. Rather, the question is whether the contempt proceeding is coercive or punitive in nature. *Id.* ¶ 15.

¶ 27    Here, there is no real question that the conduct involved—failure to admit the defendant to Alton within 60 days of receiving the court's order for commitment—occurred outside the presence of the court. Thus, the case clearly involves indirect contempt, and we may focus our discussion on the difference between civil and criminal contempt.

¶ 28    Civil contempt proceedings are appropriate when a party fails to follow a court order, thereby resulting in the loss of a benefit by the opposing party. *Hursey v. Calhoun*, 2020 IL App (5th) 190276, ¶ 67. Both the existence of a trial court order and proof that the contemnor willfully violated that order are necessary for a finding of indirect civil contempt. *Id.* Civil contempt proceedings generally begin, as they did in this case, by the filing of a petition for rule to show

9

cause. See *Betts*, 200 Ill. App. 3d at 58. The petitioner must establish by a preponderance of the evidence that the alleged contemnor has violated a court order. The burden then shifts to the contemnor to demonstrate that his or her noncompliance was not willful or that there was a valid excuse for failing to comply. *Hursey*, 2020 IL App (5th) 190276, ¶ 68.

¶ 29    As stated previously, the purpose of civil contempt is to compel compliance with a court order. *Door Properties*, 2023 IL App (1st) 230012, ¶ 30. As such, civil contempt has "two fundamental attributes." *Betts*, 200 Ill. App. 3d at 44. First, the contemnor must be able to take the action sought to be compelled. Second, once the contemnor complies with the relevant court order, no further sanctions may be imposed. *Id.* "In other words, the contemnor must have an opportunity to purge himself of contempt by complying with the pertinent court order." *Id.* Significantly, a proper purge provision must be limited to the requirement of compliance with the underlying order. See *Door Properties*, 2023 IL App (1st) 230012, ¶¶ 31, 34. A civil contempt order with a purge provision that is not so limited "has unintentionally morphed into an order of *criminal* contempt." (Emphasis in original.) *Id.* ¶ 38.

¶ 30    The purpose of criminal contempt is "to punish *past conduct* that offends the dignity of the court." (Emphasis in original.) *Weddigen*, 2015 IL App (4th) 150044, ¶ 21. The type of conduct subject to criminal contempt sanctions "covers the entire gamut of disrespectful, disruptive, deceitful, and disobedient acts (or failures to act) which affect judicial proceedings." *Betts*, 200 Ill. App. 3d at 45. In indirect criminal contempt proceedings, the party requesting a finding of contempt bears the burden of proving the allegations beyond a reasonable doubt. *Id.* at 59.

¶ 31    DHS contends that although the contempt order in this case was labeled as indirect civil contempt, in substance, it was indirect criminal contempt because the court entered a contempt finding and imposed sanctions after DHS complied with its order to admit the defendant. We agree.

10

¶ 32    First and foremost, there is no dispute that DHS complied with the pertinent order before contempt sanctions were imposed. This, alone, demonstrates that the sanctions imposed were, in substance, criminal contempt sanctions. See *Dart*, 2012 IL App (1st) 103504, ¶ 17.

¶ 33    Moreover, the purge provision imposed by the court was a nebulous instruction to DHS to improve its procedures; it was not a provision to comply with the underlying order. As we have already explained, such a purge provision goes beyond the purpose of a civil contempt order and is, therefore, improper. See *Door Properties*, 2023 IL App (1st) 230012, ¶¶ 33-36 (finding improper a "purge provision" that required the contemnor to pay the accumulated daily fines imposed pursuant to an earlier contempt finding regardless of whether he complied with the underlying order).

¶ 34    Finally, we recognize that the court was understandably frustrated with the long-standing problem of long waiting periods for admission to DHS secure facilities. However, for the reasons we have already discussed, contempt proceedings are not a proper avenue for attempting to address those problems going forward. See *J.S.*, 2022 IL App (1st) 220083, ¶¶ 80-83. Further, to the extent that the trial judge considered his 16 years of experience dealing with long delays in placement, we must emphasize that it is inappropriate to consider anything other than conduct occurring after the court enters the pertinent order—in this case, the April 28, 2023, order for commitment. See *id.* ¶¶ 76, 81. For these reasons, we conclude that despite being labeled as an order for indirect civil contempt, the court entered what was, in substance, an order for indirect criminal contempt.

¶ 35    We therefore turn our attention to DHS's second contention—its argument that the court did not accord it the procedural due process requirements applicable to criminal contempt proceedings. Again, we agree.

¶ 36 As we have already noted, the procedural requirements for imposing civil and criminal contempt sanctions differ. See *Betts*, 200 Ill. App. 3d at 49-50. Indirect civil contempt "requires only minimal due process protections." *Door Properties*, 2023 IL App (1st) 230012, ¶ 48. These include adequate notice and an opportunity to be heard. *Betts*, 200 Ill. App. 3d at 53. By contrast, parties charged with indirect criminal contempt are entitled to "the full panoply of rights afforded criminal defendants." *Door Properties*, 2023 IL App (1st) 230012, ¶ 48. These rights include the presumption of innocence, the requirement of proof beyond a reasonable doubt, the privilege against self-incrimination, and the right to have the nature of the charges set forth with specificity. *Betts*, 200 Ill. App. 3d at 58. Where, as here, the sanction imposed is a fine exceeding $500, the contemnor also has a right to demand a jury trial. *Dart*, 2012 IL App (1st) 103504, ¶ 24. Significantly, the contemnor has the right to be informed in advance that he or she is facing criminal contempt charges. This is crucial because absent such notice, it is impossible to assert these rights. *Door Properties*, 2023 IL App (1st) 230012, ¶ 49.[2]

¶ 37 Here, most of these procedural protections were absent. DHS was never notified that it was facing criminal contempt charges. DHS and Secretary Hou were required to show cause why their failure to admit the defendant to Alton sooner was not willful or contumacious, thus shifting the burden of proof. Because they were not informed in advance of the criminal nature of the proceedings, DHS and Secretary Hou could not exercise their right to demand a jury trial or insist

---

[2]In *Betts*, the court suggested that instead of beginning indirect criminal contempt proceedings with a petition for rule to show cause, a party should initiate such proceedings with a pleading styled as a "Petition for Adjudication of Criminal Contempt." *Betts*, 200 Ill. App. 3d at 58. The court explained that this was a more appropriate title because the privilege against self-incrimination means that an alleged contemnor in criminal contempt proceedings cannot be ordered to testify or show cause. *Id.* Although not addressed by the *Betts* court, such a designation would have the added benefit of providing advance notice that the contempt proceedings are to be criminal in nature. See *Dart*, 2012 IL App (1st) 103504, ¶ 22 (explaining that the petition for rule to show cause filed in that case failed to provide notice that a party faced criminal contempt proceedings in part because that title implied "that the contempt proceedings were civil in nature").

upon proof of the allegations beyond a reasonable doubt. Absent these procedural protections, the contempt order cannot stand.

¶ 38                                    III. CONCLUSION

¶ 39     For the foregoing reasons, we reverse the court's contempt order.


¶ 40     Reversed.